**In the Matter of EXECUTIVE OFFICE CENTERS, INC., Debtor.**

**Bankruptcy No. 87–00366–THK.**

United States Bankruptcy Court,
E.D. Louisiana.

Oct. 21, 1988.

William E. Steffes, Steffes & MacMurdo, Baton Rouge, La., for debtor, Executive Office Centers, Inc.

B. Franklin Martin, III, Rudy Cerone, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, La., for Burrus Inv. Group, Inc.

## FINDINGS OF FACT
## CONCLUSIONS OF LAW

THOMAS H. KINGSMILL, Jr., Bankruptcy Judge.

This matter came on for hearing before the Court after due notice, pursuant to the Order of Judge Charles Schwartz, United States District Court, Eastern District of Louisiana, on the Motion of Executive Office Centers, Inc. ("EOC") to Disallow and Objection to Allowance of Claim of Burrus Investment Group, Inc. ("BIG"). The Court has considered the arguments of counsel, the evidence adduced and the record herein, and makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

**1.**

EOC is a Louisiana corporation which filed a Petition for Relief under Chapter 11 of the Bankruptcy Code on January 26, 1987, which commenced the above-captioned bankruptcy proceeding.

**2.**

John A. Mmahat ("Mmahat") is the president, 50% shareholder, and one of the two directors of EOC.

**3.**

Paul F. Dastugue, Jr. ("Dastugue") is the secretary, 50% shareholder, and the other director of EOC.

**4.**

Mmahat is and was, at all time relevant herein, responsible for the financial and legal affairs of EOC.

**5.**

Dastugue is and was, at all time relevant herein, responsible for the day-to-day management of EOC.

**6.**

At the commencement of this bankruptcy proceeding, EOC was the owner of five major office buildings and retail shopping centers.

**7.**

As of the time of the filing of the bankruptcy, those properties and the amount of debt secured thereby appeared as follows:[1]

| BUILDINGS | SECURED CREDITOR/RANK | | AMOUNT |
|---|---|---|---|
| Independence Mall I | LASER | 1 | $1,748,897. |
| | WCC | 2 | 2,386,436. |
| Independence Mall II | PELICAN | 1 | 3,715,839. |
| | WCC | 2 | Same as above |
| Gallery Office Bldg. | MONY | 1 | 260,735. |
| | WCC | 2 | Same as above |
| 3330 Lake Villa Bldg. | WCC | 1 | Same as above |
| Medallion Office Cntr. | PELICAN | 1 | 1,434,578. |
| | FIRST COMMERCIAL | 2 | 270,135. |
| | FIRST FINANCIAL | 3 | 2,930,000. |

**8.**

All of the foregoing properties have been foreclosed on by the lenders and are no longer property of the Debtor.

**9.**

On January 28, 1987, the date after this bankruptcy proceeding was commenced, Westinghouse Credit Corporation ("WCC"), a secured creditor, filed a Motion for Relief from the Automatic Stay, or Alternatively, for Adequate Protection and for Order Directing Use of Cash Collateral (the "WCC Motion for Relief"). WCC asked this Court to lift the automatic stay to permit it foreclose against the properties in which it held a security interest, including the property commonly known as Independence Mall I.

**10.**

Trial on the WCC Motion for Relief was held on February 26, 1987 and March 20, 1987. The matter was then taken under advisement by the Court.

**11.**

At the time this bankruptcy proceeding was commenced, the Louisiana State Employees Retirement System ("LASER") was the owner and holder of a promissory note dated October 1, 1974 in the principal

---

1. The secured creditors are:
   LASER—Louisiana State Employees Retirement System;
   WCC—Westinghouse Credit Corporation;
   PELICAN—Pelican Homestead & Savings Association;
   MONY—Mutual of New York;
   FIRST COMMERCIAL—First Commercial Bank;
   FIRST FINANCIAL—First Financial Bank.

sum of $1,800,000.00, secured by a first mortgage on Independence Mall I (the "EOC Note"). The outstanding principal amount of that note and mortgage was $1,632,523.00 with interest accruing at the rate of $453.38 per diem from September 1, 1986 until paid, plus attorneys' fees and costs.

12.

LASER also was the owner and holder of a portfolio of 14 other promissory notes and first mortgages secured by real estate in various parts of Louisiana. LASER and its staff were experienced in bond investments. However, LASER and its staff did not have real estate investment experience equaling their bond investment experience.

13.

The outstanding principal balance due under the 15 mortgage loans then owned and held by LASER (the "LASER Loan Portfolio"), including the EOC Note and first mortgage on Independence Mall I, was approximately $16,000,000.00.

14.

BIG is a Louisiana corporation which invests in real estate and real estate related assets.

15.

George J. Newton, III ("Newton") is a co-founder of BIG and is the president, the chief executive officer, a director and a 25% shareholder of BIG.

16.

In late 1986 and early 1987, Vernon Strickland ("Strickland"), then director of LASER, and Newton held discussions concerning the possible purchase by BIG of the LASER Loan Portfolio.

17.

Strickland invited BIG to submit to LASER a bid for the entire LASER Loan Portfolio. The offer to be submitted by BIG had to include all of the loans in the LASER Loan Portfolio, including the EOC Note. Newton previously had rejected a proposal by Strickland for BIG to purchase only the EOC Note.

Strickland also solicited two other investment firms to submit a bid for the entire LASER Loan Portfolio. Neither investment firm made any offer to purchase the notes.

LASER did not take any further steps to make a public offering of the LASER Loan Portfolio.

18.

Big analyzed the information provided to BIG by LASER about the LASER Loan Portfolio in an attempt to arrive at an appropriate discounted present value price to be offered by Big to LASER for the LASER Loan Portfolio.

19.

The factors considered by Newton and his staff in analyzing the 15 loans in the LASER Loan Portfolio included the interest rates of the loans, the maturity dates of the loans, the legal documentation evidencing the loans, the Louisiana real estate serving as collateral for the loans, the risks of collection of the loans, the costs inherent in servicing the loans, the cost of financing to BIG to purchase the loans, the conditions of and tenancies in the properties serving as collateral for the loans, the profit potential to BIG commensurate with the risk inherent in purchasing the loans, the possibility of purchase offers being made to LASER by others for the portfolio and a prior mortgage loan purchase transaction entered into between LASER and BIG.

20.

Based on this analysis, BIG decided to offer to LASER the total sum of approximately $11,000,000.00 for the LASER Loan Portfolio. This offer equalled approximately 68.6% of the aggregate amount of unpaid principal then due and owing under all of the loans in the LASER Loan Portfolio.

21.

BIG structured the actual offer to LASER in slightly different terms, however, offering to purchase 14 loans at 70% of the unpaid principal amount and offering to purchase the EOC Note at 45% of the unpaid principal amount.

22.

A formal offer was submitted by Newton, on behalf of BIG, to the entire Board

of Trustee of LASER, at the Board's regular monthly meeting in Baton Rouge on March 27, 1987.

23.

Public notice was given of that meeting and the items on the agenda in accordance with normal LASER procedures. That Board meeting also was open for public attendance.

24.

After consideration of the BIG offer, the Board of Trustees made a counter offer during that meeting of 70% of the unpaid balance of 14 of the loans and 50% of the unpaid principal balance of the EOC Note.

25.

The LASER counter offer was accepted by BIG and the Board of Trustees of LASER unanimously approved the sale on those terms.

26.

The sale of the LASER Loan Portfolio was consummated on May 13, 1987 through the execution of 15 separate acts of notarial endorsement of the 15 notes and mortgages from LASER to BIG.

27.

Big funded the purchase price of approximately $11,000,000.00 through an interim demand loan from the Whitney National Bank in New Orleans, which interim loan was replaced three months later with a three-year term loan from Hibernia National Bank in New Orleans.

28.

Other than the transaction involving the purchase of the LASER Loan Portfolio and the previous transaction in 1986 concerning the purchase by BIG of another first mortgage from LASER, there existed no business, no social, no political, and no other contacts, relations or transactions of any kind between LASER and its trustees, officers, directors and employees, on the one hand, and BIG and its officers, directors, shareholders and employees, on the other hand.

29.

Other than the EOC Note and a passing social relationship between Mmahat and a director of BIG, there was no business, no social, no political and no other contacts, relations or transactions of any kind between EOC and its officers, directors, shareholders and employees, on the one hand, and BIG and its officers, directors, shareholders and employees, on the other hand.

30.

After BIG acquired the LASER Loan Portfolio, it became aware of the pendency before this Court of the WCC Motion for Relief concerning, inter alia, the ability of WCC to foreclose under its second mortgage affecting Independence Mall I.

31.

In order to protect its position as first mortgagee on the Independence Mall I, BIG filed a similar motion for relief from the automatic stay on June 4, 1987 (the "BIG Motion for Relief").

32.

BIG did not seek to prosecute its motion for relief; instead, it simply asked that, if this Court granted WCC relief from the stay under the WCC Motion for Relief, the Court also grant such relief to BIG.

33.

On June 10, 1987, in response to the BIG Motion for Relief, EOC opposed the motion and requested this Court to hold a hearing on the motion.

34.

In addition, on June 18, 1987, EOC filed against BIG the Motion to Disallow and Objection to Allowance of Claim (the "EOC Motion to Disallow Claim") seeking to have the secured claim of BIG based on the EOC Note disallowed in its entirety or reduced.

35.

The EOC Motion to Disallow Claim alleged that BIG purchased this claim after the commencement of the bankruptcy and that BIG paid $816,261 for the claim on which $1,768,492 was due. Based on this allegation, EOC sought the following alternative relief: to have the claim disallowed for failure to comply with Bankruptcy Rule 3001(e); to disallow or reduce the claim because BIG's purchase constituted the

sale of a litigious right under the Louisiana Civil Code; or to disallow or reduce BIG's claim because to allow the claim in full "would result in an unconscionable and unreasonable windfall to Burrus to the prejudice of the second mortgage holder, Westinghouse Credit Corporation, as well as to the unsecured and under-secured creditors of the estate."

36.

On July 20, 1987, this Court issued Findings of Fact and Conclusions of Law concerning, inter alia, the WCC Motion for Relief. In those Findings of Fact and Conclusions of Law this Court found that there then was no equity in Independence Mall I over the total amount of secured debt bearing against it; that Independence Mall I was not necessary to an effective reorganization of EOC; and that an effective reorganization of EOC was unlikely because of an over burden of debt, no source of funds to aid in the reorganization effort, and a pattern of the mismanagement of the properties by EOC.

37.

On July 20, 1987, this Court issued an order lifting the automatic stay in order to allow WCC to proceed to enforce its second mortgage against Independence Mall I.

38.

On August 20, 1987, this Court held a hearing on the BIG Motion for Relief and the EOC Motion to Disallow Claim. The matters were then taken under advisement.

39.

On August 3, 1987, the Court-appointed examiner in this case, Philip A. Garrett, C.P.A., issued a report on his examination of the books and records of EOC. As a result of that report, a Motion For Appointment of Trustee filed by Pelican Homestead and Savings Association ("Pelican"), and a further report of the examiner, dated December 10, 1987, this Court authorized the examiner to retain a professional management company to administer the property still owned by EOC in place of management by EOC.

40.

On or about November 2, 1987, EOC and WCC entered into a Compromise and Settlement Agreement (the "WCC Settlement"), pursuant to which the parties settled all disputes and controversies existing between them. The WCC Settlement was submitted to this Court for approval on November 2, 1987.

41.

On December 8, 1987, BIG filed an objection to the WCC Settlement on the grounds that the settlement was not in the best interests of the estate, was not fair and equitable, was a *de facto* plan of reorganization and was confected through an impermissible solicitation by EOC of WCC's acceptance of a plan of reorganization before approval of a disclosure statement.

42.

A hearing was held on December 18, 1987 on approval of the WCC Settlement at which time the Court took under advisement the objection of BIG as well as the objections of the Bank of Louisiana, Acadia State Bank and the Unsecured Creditors Committee in this case.

43.

A further hearing was held on February 25, 1988, on approval of the WCC Settlement after which this Court issued an order approving the settlement.

44.

On March 7, 1988, BIG timely filed a Notice of Appeal pursuant to which BIG appealed the February 25, 1988 order of this Court approving the WCC Settlement. On August 2, 1988, the District Court issued an order upholding this Court's Order approving the WCC Settlement, and that District Court Order has now become final.

45.

On April 15, 1988, this Court issued Findings of Fact and Conclusions of Law and two Orders denying EOC's objection to BIG's claim, and granting BIG relief from the automatic stay.

46.

EOC appealed both decisions to the District Court.

**47.**

The District Court held oral arguments on those appeals on August 3, 1988, and issued several Orders and an Opinion, dated August 11, 1988, in connection therewith.

**48.**

On the disallowance issues, the District Court affirmed this Court as to the Rule 3001(e) issue and the litigious right question, and remanded to this Court "for further consideration of whether the Bankruptcy Court should have utilized its equitable powers to reduce the Burrus claim," noting that this Court "is in the best position to make the initial determination and/or hold hearings to decide whether or not to grant the creditors the equitable relief requested of limiting Burrus, value paid for the claim."

**49.**

On the stay issue, the District Court affirmed the stay lift order, but required BIG to post a letter of credit for the difference between $1,029,618 and $1,506,000, the amount for which Independence Mall I was sold at foreclosure sale.

**50.**

Independence Mall I ultimately sold at foreclosure sale to BIG for $1,506,000, and BIG posted a letter of credit with the Clerk of Court in the amount of $476,382, the difference between $1,506,000, the sale price and $1,029,618.

**51.**

EOC now seeks to recover the proceeds of that letter of credit.

**52.**

The value of the Independence Mall I has declined substantially during the course of this bankruptcy case.

**53.**

An appraisal of Independence Mall I was performed by R.H. Jenkins, M.A.I., dated February 20, 1987 (the "Jenkins Appraisal"), which concluded that the fair market value of Independence Mall I was then $2,400,000.

**54.**

In its Findings of Fact and Conclusions of Law, dated July 20, 1987, this Court adopted the Jenkins Appraisal for purposes of the WCC Motion for Relief and found that the market value of Independence Mall I was then $2,400,000.

**55.**

Further appraisals of the property were performed in early August 1988, in connection with the judicial sale of Independence Mall I. Joe Ovella, using a cost-replacement approach to value, found the property to have a then market value of $2,151,000. Michael W. Truax, M.A.I., using an income approach to value, found the property to have a then market value of $2,100,000.

**56.**

Independence Mall I was, however, sold at judicial sale on August 10, 1988 for only $1,506,000.

**57.**

BIG was the only bidder at that judicial sale. Neither EOC nor the Unsecured Creditors Committee nor any other creditor of this bankruptcy estate submitted a bid for the property at the judicial sale.

CONCLUSIONS OF LAW

**1.**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 105(a) and 502.

**2.**

This is a core proceeding and this Court may issue a final order pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(B).

**3.**

This is a contested matter governed procedurally by Rule 9014 of the Bankruptcy Rules.

**4.**

■ Any claim of EOC in this contested matter based upon the equitable subordination provisions of 11 U.S.C. § 510(c) was improperly brought because such claims were not pleaded in the EOC Motion to Disallow Claim and because such claims may only be brought pursuant to an adver-

sary proceeding under Part VII of the Bankruptcy Rules. Bankruptcy Rule 7001(8); *see Matter of Missionary Baptist Foundation of America,* 712 F.2d 206 (5th Cir.1983); *Matter of Clark Pipe and Supply Co., Inc.,* 87 B.R. 21 (E.D.La.1988).

### 5.

All findings of fact listed above which may be construed to be conclusions of law are deemed incorporated herein.

### 6.

The legal issue now before this Court is a very narrow one: whether or not the Court can reduce BIG's claim pursuant to 11 U.S.C. § 105; and, if so, how much should be BIG's claim be reduced.

### 7.

Section 105(a) of the Bankruptcy Code grants the Bankruptcy Court broad power, consistent with the provisions of Title 11, to issue any order that is necessary or appropriate to carry out the provisions of the Code. 11 U.S.C. § 105(a).

### 8.

■ However, the exercise of the equitable powers conferred under Section 105(a) are subject to limitations and should be invoked only under extraordinary or compelling circumstances. *In re Trang,* 58 B.R. 183, 189 (Bankr.S.D.Tex.1985); *see also United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986); *In the Matter of Electronic Theatre Restaurants Corporation,* 53 B.R. 458, 462 (N.D.Ohio 1985); *In re Packers' Cold Storage, Inc.,* 64 B.R. 265, 267 (Bankr.C.D.Cal.1986). The provision "does not authorize bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law or constitute a roving commission to do equity." *United States v. Sutton, supra* at 1308; *accord Southern Ry. Co. v. Johnson Bronze Co.,* 758 F.2d 137, 141 (3rd Cir. 1985); *In re FCX, Inc.,* 60 B.R. 405, 410–11 (E.D.N.C.1986); *In re Riso,* 57 B.R. 789, 793 (D.N.H.1986); *Packers' Cold Storage, supra* at 267.

### 9.

■ A Bankruptcy Court, as a court of equity, may look to the substance of a transaction and, if appropriate, devise new remedies where those in law are inadequate. *In re Global Western Development Corp.,* 759 F.2d 724, 727 (9th Cir. 1985); *see also Pepper v. Litton,* 308 U.S. 295, 304–05, 60 S.Ct. 238, 244–45, 84 L.Ed. 281 (1939).

### 10.

However, the equity powers of the bankruptcy courts are well defined and limited and may not be exercised in defiance of express rules of law. *In re Sutton,* 43 B.R. 250, 252 (Bankr.D.Conn.1984); *In re Burley,* 11 B.R. 369, 373 (Bankr.C.D.Cal. 1981), *aff'd on other grounds,* 738 F.2d 981 (9th Cir.1984).

### 11.

Both applicable Louisiana law and federal bankruptcy law expressly sanction enforcement of the full amount of an assigned claim.

### 12.

A negotiable instrument (such as a promissory note) is a valuable article of commerce and Louisiana law specifically recognizes its transferability. La.Civ.Code arts. 2448 and 2449; La.R.S. § 10:3–301.

### 13.

In the event of such a transfer, the transferee steps into the shoes of the transferor and may enforce against the maker all rights available under the instrument at the time of its transfer. La.R.S. § 10:3–201(1).

### 14.

Commercial loan discounting facilitates commerce by providing a means of raising capital through the sale of debt instruments at a discount. *Budget Plan of Baton Rouge, Inc. v. Talbert,* 276 So.2d 297 (La.1973); *Lubbock Hotel Co. v. Guaranty Bank & Trust Co.,* 77 F.2d 152 (5th Cir. 1935). The Louisiana legislature, as early as 1856, recognized the desirability of this commercial practice by excepting loan discounting from certain areas of pervasive legal, economic and social import, such as usury. See La.Act No. 161 (March 20, 1856); La.Civ.Code art. 2924; *People's*

*Bank & Trust Co. v. Fenwick Sanitarium, Ltd.,* 130 La. 723, 58 So. 523 (1912).

**15.**

Federal bankruptcy law also recognizes the transferability of creditors' claims. *In re Quakertown Shopping Center, Inc.,* 366 F.2d 95, 98 (3d Cir.1966) *(citing 3 Collier on Bankruptcy* § 57.06 (14th ed. 1966)).

**16.**

Once a claim is assigned, the assignee succeeds to all rights of his transferor. *Citibank, N.A. v. Tele–Resources, Inc.,* 724 F.2d 266 (2d Cir.1983); *accord In re Elliott,* 385 F.Supp. 1194, 1196–97 (M.D.La. 1974).

**17.**

■ In accordance with the foregoing rules of law, BIG's rights under the EOC Note, as the assignee of LASER, are not affected by the price BIG actually paid to acquire the claim. BIG is entitled to step into the shoes of LASER and enforce the EOC Note to its full tenor.

**18.**

Notwithstanding an assignee's legal right to recover the full value of an assigned instrument, the jurisprudence recognizes that an assignee's rights may be limited in certain well-defined situations.

**19.**

■ However, for the Bankruptcy Court to invoke its equitable powers and disallow or limit an assigned claim, the assignment must (1) involve a breach of fiduciary duty, fraud, misrepresentation or overreaching, and (2) the foregoing circumstances must have enabled the assignee to acquire the claim for inadequate consideration. Absent such conduct and inadequate consideration, there is no basis, legal or equitable, under which the Bankruptcy Court may limit the amount of the assignee's claim. 6 *Collier on Bankruptcy,* § 9.04, p. 1535–37 (14th Ed.1978).

**20.**

■ In the present case, EOC has neither alleged nor proven any of the foregoing elements necessary to justify the equitable reduction of the BIG claim.

**21.**

The courts have repeatedly refused to limit a creditor's claim to the discounted purchase price where the court found that the facts did not create a fiduciary status or breach of fiduciary duty. *In re Lorraine Castle Apartments Building Corporation,* 149 F.2d 55 (7th Cir.), *cert. denied,* 326 U.S. 728, 66 S.Ct. 35, 90 L.Ed. 432 (1945); *In re V–I–D, Inc.,* 101 F.Supp. 71, 75 (N.D.Ind.1951), *aff'd on other grounds,* 198 F.2d 392 (7th Cir.1952), *cert. denied sub nom., Kelly, Glover & Vale v. Kramer,* 344 U.S. 914, 73 S.Ct. 337, 97 L.Ed. 705 (1953); *In the Matter of Moulded Products,* 474 F.2d 220, 224 (8th Cir.), *cert. denied,* 412 U.S. 940, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973); *In re Franklin Bldg. Co.,* 178 F.2d 805, 808 (7th Cir.1949), *cert. denied,* 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1383 (1950); *In re Automatic Equipment Manufacturing Company,* 106 F.Supp. 699, 708 (D.Neb.1952) *appeal dismissed per curiam,* 202 F.2d 955 (8th Cir. 1953); *In re Philadelphia & Western Ry. Co.,* 64 F.Supp. 738, 741 (E.D.Penn.1946); *In re Indiana Central Telephone,* 24 F.Supp. 342, 344 (D.Del.1938); *In re Celotex Co.,* 12 F.Supp. 1, 5 (D.Del.1935).

**22.**

A second line of cases sets forth the rule that absent fraud, the price which a creditor pays for his claim does not affect the measure of his participation in the reorganization of the debtor. *Security–First National Bank of Los Angeles v. Rindge Land & Navigation Co.,* 85 F.2d 557, 563–64 (9th Cir.1936), *cert. denied,* 299 U.S. 613, 57 S.Ct. 315, 81 L.Ed. 452 (1937); *Standard Gas & Electric Co. v. Deep Rock Oil Corporation,* 117 F.2d 615, 619 (10th Cir.1941), *cert. denied,* 313 U.S. 564, 61 S.Ct. 842, 85 L.Ed. 1523 (1941); *In re Pittsburgh Rys. Co.,* 159 F.2d 630, 632–33 (3d Cir.1946), *cert. denied,* 331 U.S. 819, 67 S.Ct. 1309, 91 L.Ed. 1837 (1947); *see also Mokava Corporation,* 147 F.2d 340 at 344 (2nd Cir.1945); *Texas Hotel Securities Corporation v. Waco Development Com-*

*pany,* 87 F.2d 395, 399 (5th Cir.), *cert. denied,* 300 U.S. 679, 57 S.Ct. 671, 81 L.Ed. 883 (1937); *In re Utilities Power & Light Corporation,* 29 F.Supp. 763, 770 (N.D.Ill. 1939).

23.

The only authority limiting claims purchased post-petition at a discount, where the profit of the assignee was at issue, are cases where the court found that the creditor occupied a fiduciary status with respect to the debtor. *Pepper v. Litton, supra* 308 U.S. at 311–12, 60 S.Ct. at 247–48 (though holding that creditor's status as fiduciary and insider were sufficient alone to justify use of court's equitable powers, court stated that the "planned and fraudulent scheme" of the creditor made the necessity of equitable relief insistent); *Franklin Building Company, supra* at 808; *Monroe v. Scofield,* 135 F.2d 725, 728 (10th Cir.1943); *In re The Van Sweringen Company,* 119 F.2d 231, 234 (6th Cir.), *cert. denied,* 314 U.S. 671, 62 S.Ct. 136, 86 L.Ed. 537 (1941); *In re Norcor Manufacturing Company,* 109 F.2d 407, 411 (7th Cir.), *cert. denied,* 310 U.S. 625, 60 S.Ct. 898, 84 L.Ed. 1396 (1940); *Philadelphia & Western Ry. Co., supra* at 740–41; *In re Los Angeles Lumber Products Company,* 46 F.Supp. 77, 85 (S.D.Cal.1941); *In re McCrory Stores Corporation,* 12 F.Supp. 267, 269 (S.D.N.Y.1935); *see also American United Mutual Life Insurance Company v. City of Avon Park,* 311 U.S. 138, 145–46, 61 S.Ct. 157, 161–62, 85 L.Ed. 91 (1940).

24.

The basis for the limitation in these cases was the application of the equitable principle that a fiduciary shall not be allowed to profit from his trust. *Pepper v. Litton, supra* 308 U.S. at 311, 60 S.Ct. at 247; *Franklin Building Company, supra* at 808; *Monroe v. Scofield, supra* at 728; *The Van Sweringen Company, supra* at 234–35; *Norcor Manufacturing, supra* at 411; *Philadelphia Ry. Co., supra* at 740; *Los Angeles Lumber Products, supra* at 92; *McCrory Stores, supra* at 269.

25.

The case law which permits the court to look beyond the form of a transaction and examine its substance does not conflict with the general rule requiring the existence of exceptional circumstances before invoking the equity jurisdiction of the court. The court's equity powers permit it to "sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper v. Litton, supra* 308 U.S. at 307–08, 60 S.Ct. at 245–46; *see also In re Keyworth,* 47 B.R. 966, 971–72 (Bankr.D. Colo.1985) (court disallowed claim after determining that claim was acquired post-petition for the purpose of harassing the debtor and/or seeking advantage over debtor in a personal injury suit pending in state court; profit of the creditor, where a $75.00 claim was purchased for $50.00, was not at issue).

26.

The rule of *Pepper v. Litton* does not, however, alter the general rule requiring the existence of fraud or breach of fiduciary obligations before the court can disregard the applicable laws of property rights.

27.

In addition to the requirement of fraud or similar misconduct, the cases also require a finding that the assignee purchased the claim for less than adequate consideration.

28.

The only fraud case which also specifically discusses the issue of the extent of a discount necessary to constitute inadequate consideration is *In re Automatic Equipment Manufacturing Company,* 106 F.Supp. 699, 706 (D.Neb.1952). There the court stated that it "cannot, without indulging in considerable speculation, conclude that the claims in question were purchased for an inadequate consideration. The actual value of the claims is dependent on too many factors indeterminable, not only when the claims were purchased, but even at this state of the proceedings." *Id.* This is exactly the same type of analysis used by this Court in its conclusions of law, dated April 15, 1988, entered after the original trial on this matter.

**29.**

In the present case, EOC does not allege that BIG acquired the claim for "inadequate consideration", but only that BIG stands to make a "windfall" on this transaction. Moreover, as was demonstrated at trial through the testimony of Newton and Strickland, BIG clearly paid adequate consideration for this claim. EOC presented no countervailing evidence.

**30.**

The EOC Note was purchased as part of an $11,000,000 transaction involving the acquisition of 15 separate mortgage notes. The consideration paid for the EOC Note was determined in connection with the pricing of the entire LASER Loan Portfolio. There is no basis in fact to conclude that the price for the EOC Note can be looked at separately from the other notes purchased at the same time and that the price paid was in any way inadequate.

**31.**

The present value of the EOC Note, which bears a fixed rate of interest at 10% and a remaining term of 20 years, is substantially less than its face value. That note is worth even less because it is secured by Metairie shopping center which is half vacant and EOC, the maker of the note, is immersed in contentious chapter 11 bankruptcy proceedings.

**32.**

EOC failed to establish the existence or breach of any fiduciary duty by BIG or of fraud, misrepresentation or overreaching by BIG in the acquisition of the EOC Note from LASER. EOC also failed to establish that BIG paid inadequate consideration to LASER for the EOC Note.

**33.**

EOC's obligation on the EOC Note was exactly the same both before and after BIG purchased the EOC Note. As pointed out by this Court in its April 15, 1988 ruling, neither EOC nor its creditors have suffered the slightest injury or loss as a result of BIG's acquisition of the EOC Note.

**34.**

Therefore, there are no grounds for this Court to invoke its equitable powers to disallow or limit the claim of BIG in this bankruptcy case.

**35.**

The WCC Settlement reduced the amount of the second mortgage bearing against Independence Mall I to $200,000. However, as of August 10, 1988, the date the property was sold at judicial sale, the full amount due under the EOC Note and corresponding first mortgage against Independence Mall I was $1,966,166.05, plus attorneys, fees and costs. Therefore, the total debt secured by Independence Mall I exceeded $2,166,166.05.

**36.**

Independence Mall I had a market value at the time of the judicial sale of, at most, $2,151,000 or, at least, $1,506,000.

**37.**

The failure of EOC, the Unsecured Creditors Committee or any other third party to bid for the property at the judicial sale is further evidence that the true value of the property was substantially less than the mortgage debt bearing against it.

**38.**

Therefore, because the amount of the secured debt exceeded the value of the property throughout this bankruptcy proceeding, there was no equity in Independence Mall I which may have been of potential benefit to EOC or its unsecured creditors.

**39.**

For all of the foregoing reasons, an Order will be entered denying EOC's motion to disallow or reduce the claim of BIG in this bankruptcy.