**In the Matter of MUNFORD, INC., d/b/a Majik Market, Debtor.**

**MUNFORD, INC., d/b/a Majik Market, Plaintiff,**

v.

**TOC RETAIL, INC. and Majik Market Management Corp., Defendants.**

**Bankruptcy A90–00078–WHD. Adv. No. 90–0110A.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

June 13, 1990.

See also, Bkrtcy., 115 B.R. 388.

Alfred S. Lurey, Dennis S. Mier, Kilpatrick & Cody, Atlanta, Ga., for debtor/plaintiff.

Stephen D. Busey, E. Lanny Russell, Smith & Hulsey, Jacksonville, Fla., Morton P. Levine, Levine & D'Alessio, Atlanta, Ga., for defendants.

Mark S. Kaufman, Laura F. Nix, Long, Aldridge & Norman, Atlanta, Ga., for the Official Committee of Unsecured Creditors of Munford, Inc.

## ORDER

W. HOMER DRAKE, Jr., Bankruptcy Judge.

On February 20, 1990, Munford, Inc. (hereinafter "Munford") filed a complaint against TOC Retail, Inc. (hereinafter "TOC") and Majik Market Management Corporation (hereinafter "MMMC"), collectively referred to as "Defendants," seeking a judgment substantively consolidating Defendants' assets and operations with those of Munford. The matter is currently before the Court on Defendants' motion to dismiss the complaint, filed on March 23, 1990. It is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and (O) (1990). Having considered the responsive briefs filed by Munford and the Unsecured Creditors' Committee, as well as the Defendants'

additional reply brief and the record in the case file, the motion is DENIED for the reasons set forth below.

## I.

■ For a Motion to Dismiss to succeed, it must clearly appear from the complaint that Munford could prove no set of facts in support of its claims that would entitle it to relief, *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *In re Valley Liquors, Inc.*, 103 B.R. 961, 963 (Bankr.N.D.Ill.1989). The Court must consider both pleaded facts and reasonable inferences from pleaded facts, in a light most favorable to the plaintiff, *Valley Liquors*, 103 B.R. at 964. Thus, for the purposes of evaluating the Motion to Dismiss, this Court must assume that the allegations of Munford's complaint are true and correct, *In re Fidelity Elec. Co.*, 43 B.R. 385, 387 (Bankr.E.D.Pa.1984). With this in mind, the allegations of the complaint are as follows.

Munford owns a chain of approximately 500 convenience stores and also owns the tradename "Majik Market," under which the stores are operated. TOC owns a chain of approximately 343 convenience stores licensed by Munford to operate under the "Majik Market" name which operate in the same manner and sell the same types of products. MMMC was organized to provide management services jointly to TOC and Munford. Before Munford filed its voluntary Chapter 11 petition on January 2, 1990, the three companies had exactly the same executive officers, and before November 1989 the companies shared three additional directors.

The interrelationship of Munford and TOC was created approximately one year earlier. On November 29, 1988, Alabama Acquisition Corporation ("AAC") purchased 100% of Munford's stock, and on December 15, 1988, Tenacqco Acquisition Corporation ("TAC") acquired all of TOC's shares. AAC and TAC were created for the sole purpose of making these acquisitions and were owned and controlled by Panfida Group, Inc. ("Panfida Group"), a corporation established by Panfida PLC

and by a trust created by Philip Handy. Financing for AAC's acquisition of Munford was arranged through Citicorp North America, Inc. ("Citicorp"), and was secured by a security interest in substantially all of Munford's assets. Bankers Trust Company financed approximately $82 million of the TOC acquisition as a term loan secured by TOC's assets, and Donaldson, Lufkin & Jenrette provided approximately $47 million in bridge notes on an unsecured basis to complete the TOC financing.

In connection with the closing of TOC's acquisition, Philip Handy told Citicorp, the Munford lender, of Panfida Group's desire to have Munford's executive officers direct TOC as well, to organize a management corporation to provide management services to both Munford and TOC, to operate the stores of both Munford and TOC under the "Majik Market" tradename, and to merge Munford with TOC as soon as possible. Citicorp consented to shared management and the shared tradename, and Panfida Group promptly closed the TOC acquisition. Thereafter Panfida Group operated Munford and TOC in material respects as a single entity, using MMMC as the management company for both.

Munford's complaint offers the following illustrations of its interrelationship with TOC and MMMC:

—In anticipation of the TOC closing, Munford entered into a lease with Parkview Center, Ltd., a company controlled by Philip Handy, for space in office buildings in Casselberry, Florida to be used as corporate headquarters for Munford, TOC and MMMC. After the lease was signed, the executive officers of the three companies moved out of Munford's Atlanta headquarters and into the Casselberry facility, and the Atlanta facility was ultimately sold.

—Munford also acquired a telephone system in its name but shared by all three companies and listed in TOC's books as one of its assets.

—Munford entered a contract with its largest grocery supplier prior to the TOC acquisition to supply all of its locations as well as the anticipated TOC stores, depend-

ing on the combined buying power of the Munford and TOC stores and providing benefits to both Munford and TOC that would not have been available to either company alone.

—Munford entered into a fleet leasing contract for cars and light trucks under which vehicles were leased for personnel from all three companies.

—Munford paid for printing costs to produce two "Majik Market" brochures for recruiting employees which represented that Majik Market was a single chain of convenience stores.

—Munford bought a computer system from an affiliate of Panfida Group for the benefit of the three companies (which ultimately proved to be unworkable).

—MMMC, based on combined operations of Munford and TOC but in its own name, entered a variety of contracts with suppliers of goods and services to obtain commissions, rebates, allowances and other economic benefits for Munford and TOC, based upon combining store locations operated by both Munford and TOC.

—In other instances, suppliers entered into agreements with "Majik Market" that did not clearly differentiate between Munford's and TOC's store locations.

—MMMC's 1989–90 marketing plan for Munford and TOC listed several advantages to the integration of the companies, including experienced and market-oriented senior management, more buying power and economies of scale, strong buying and negotiating skills, and excellent vendor support and commitments to "Majik Market."

—Business decisions were made by the executive officers to maximize the joint operational efficiencies and economies of scale of Munford and TOC collectively rather than to determine what was best for them as separate entities.

—The executive officers gave interviews and issued press releases regarding the consolidation of the operations of Munford and TOC, referring to the stores as a single chain of over 800 stores, or referring to Munford as the parent of the combined "Majik Market" stores.

—The three companies used business stationery with only "Majik Market" and the Casselberry address on it.

—Munford and TOC commingled their insurance arrangements in sixteen separate insurance policies, usually naming either "Panfida Corporation" or "Panfida Corporation and its subsidiaries" as the insured, or naming both Munford and TOC as the insured. Because of the size of the deductibles or self-insurance retentions in some instances, TOC obtained letters of credit to support Munford.

—In some jurisdictions TOC used licenses to sell money orders that were obtained by Munford to support the sale of such money orders by TOC. TOC furnished letters of credit or bonds on behalf of both Munford and TOC to support these agreements.

—In anticipation of the eventual merger of the companies, Munford's Board of Directors (composed of the same people as TOC's board) approved TOC's adoption of Munford's Profit Sharing Plan and designated TOC officially as an affiliated company under the Plan. This and other benefit plans were consolidated and jointly administered so that the employees of Munford, TOC and MMMC received the same benefits.

The above examples illustrate that contracts were entered by Munford, TOC or MMMC for the benefit of both Munford and TOC; funds were advanced and received by MMMC and allocated in a way that had little or no relationship to the actual benefit or burden to the respective parties; and intercompany balances of several million dollars were established as directed by MMMC to allocate revenue or expenses between Munford and TOC. Yet Munford alleges that key records and documents regarding these intercompany balances are outside of its possession or control, and as a result Munford cannot prepare with confidence independent financial statements and would incur "significant expense" to determine the separate financial conditions of the three companies. Addi-

tionally, Munford contends that the business functions of the companies cannot be separated without a physical division of their operations, records, and personnel, which would result in lost economies of scale in vendor contracts and increased rental, payroll, insurance and other operating costs. Moreover, trade creditors had made decisions about transacting with "Majik Market" based on the combined strength of Munford and TOC, and any attempt to separate them would operate to the disadvantage of these trade creditors.

Munford contends that substantive consolidation would produce a more economically viable business operation that can reduce operating costs and that will have greater negotiating strength, as was the case before Munford filed its Chapter 11 petition. The trade creditors would also benefit, and Bankers Trust Company, TOC's secured lender, would not be prejudiced. Finally, Munford alleges that the unencumbered assets of the three companies on a consolidated basis may be sufficient to satisfy the claims of the unsecured creditors of both Munford and TOC.

## II.

Defendants attack Munford's complaint first by asserting that the above allegations do not entitle Munford to the relief that it seeks. Unfortunately, there is no recent case law from the Eleventh Circuit Court of Appeals which deals with the topic of substantive consolidation, and the only Circuit Court case emerging from this region, from the old Fifth Circuit, is *Maule Indus. Inc. v. Gerstel,* 232 F.2d 294 (5th Cir.1956). In that case, the Fifth Circuit affirmed the District Court's denial of a creditor's action to consolidate the assets of the debtor corporation with those of a nondebtor affiliated corporation, ruling that the two companies were entirely separate entities and that there was no justification for disregarding the corporate fiction, *Id.* at 297. The case was based on the common law "instrumentality" or "alter ego" theory, in which the plaintiff must prove that one corporation was the instrumentality of the other and that the corporation whose property is sought to be brought

into the bankruptcy proceeding existed in form only and not existing in substance or reality as a separate entity, *Id.* To do this, the plaintiff must show identity of corporate names, shareholders, and officers, and an intermingling of affairs; and it must also prove that the corporation whose property is sought to be brought into the bankruptcy proceeding was organized to hinder, delay or defraud creditors, *Id.* Defendants assert that Munford's complaint should be dismissed because it failed to allege that TOC was organized to hinder, delay or defraud creditors.

■ In arguing that *Maule* should bind the Court's decision in this case, Defendants correctly point out that a circuit court decision is binding upon future decisions of courts in that circuit, but that proposition assumes that the future decisions recall the same questions of law and fact as the circuit court decision. Munford's theory of recovery is distinct from the consolidation available under the "instrumentality" theory. As will be discussed in more detail below, substantive consolidation may be based on a finding that it would be more equitable to all of the parties to allow consolidation under the circumstances of the case, *In re Tureaud,* 59 B.R. 973, 975–76 (N.D.Okl.1986); *In re Baker & Getty Fin. Serv. Inc.,* 78 B.R. 139, 142 (Bankr.N.D.Oh.1987); *In re Snider Bros., Inc.,* 18 B.R. 230, 234 (Bankr.D. Mass.1982), by showing that the affairs of the entities are inextricably intertwined or that creditors dealt with them as a single economic unit, and does not require a finding of fraud or intent to hinder or delay creditors. The fact that the Eleventh Circuit Court of Appeals has not yet addressed this newer consolidation theory cannot prevent lower courts from hearing the issue, and in fact lower courts in the old Fifth and new Eleventh Circuits have done so, *see, e.g., In re Gainesville P–H Properties, Inc.,* 106 B.R. 304 (Bankr.M.D. Fla.1989); *Holywell Corp. v. Bank of N.Y.,* 59 B.R. 340 (S.D.Fla.1986), *appeal dismissed sub nom Miami Center Ltd. v. Bank of N.Y.,* 820 F.2d 376 (11th Cir.1987), *reh'g denied* 826 F.2d 1010 (11th Cir.1987),

*vacated* 838 F.2d 1547 (11th Cir.1988), *cert. denied* 488 U.S. 823, 109 S.Ct. 69, 102 L.Ed.2d 46 (1988).

Accordingly, this Court shall address the substantive consolidation issue as it has developed outside of the Eleventh Circuit. The most recent circuit court opinion on the issue came from the Second Circuit in *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515 (2d Cir.1988). In that case, Augie's Baking Co. and Restivo Brothers Bakery entered into an agreement wherein Restivo acquired all of Augie's stock and changed its name to Augie/Restivo Baking Co., and Augie wound up its affairs, but never dissolved. Both companies eventually filed Chapter 11 petitions and then filed a motion for substantive consolidation, which was approved by the Bankruptcy and District Courts but was rejected by the Second Circuit Court of Appeals. The Circuit Court considered the long list of factors justifying consolidation which were enumerated by the various courts that have adjudicated the issue and boiled its analysis down to two apparently alternative factors:

(i) whether creditors dealt with the entities as a single economic unit and "did not rely on their separate identity in extending credit," ... or

(ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors ...

*Id.* at 518 (*citations omitted*). For the purposes of this Motion to Dismiss, the Court will evaluate Munford's allegations using the *Augie/Restivo* factors as a point of reference to determine if substantive consolidation is justified on the face of the complaint.[1]

**A. Whether creditors dealt with the entities as a single economic unit.**

■ There are really two categories of creditors that must be treated separately—the secured lenders and the unsecured trade creditors—when considering this factor. The trade creditors' dealings with "Majik Market" as a single economic unit is clear on the face of the complaint in this case. The three companies entered a fleet lease, insurance contracts, and other contracts for goods and services for their combined benefit, and it can be reasonably inferred that their operation as one chain of approximately 800 stores induced trade creditors to enter these contracts. Moreover, the public representations in recruitment brochures, press releases and interviews, and even business stationery led creditors to believe that "Majik Market" operated as a single unit. Arguably, the separation of Munford from TOC would be detrimental to these creditors.

The Second Circuit found the same reliance on the debtors' operation as a single unit by trade creditors in *Augie/Restivo*, but weighed the concerns of secured lenders more heavily. That Court found that the lenders loaned money to Augie and to Restivo when they were still separate entities, and at least one lender had no knowledge of their merger negotiations. Moreover, consolidation would have caused the undersecured claim of Augie's lender to be subordinated to the unsecured administrative claim of Restivo's lender, an unequitable result which far outweighed the benefits to trade creditors from consolidation. *Id.* at 519.

---

1. Defendants read the language in *Augie/Restivo* as creating concrete barriers that must be overcome before consolidation may be allowed, while Munford believes that these factors must be applied flexibly depending on the circumstances of the case. This Court is inclined to agree with Munford's position. First, the two factors are admittedly a synthesis of the more specific factors which were popular with other courts that considered the substantive consolidation question, and the Court feels comfortable in consulting with earlier decisions that discuss these specific factors. A corollary to this observation is that each *Augie/Restivo* factor involves multiple considerations, and as a result the ad-

judication of the consolidation issue is necessarily going to be fact-intensive. Second, the Second Circuit noted that substantive consolidation is "a measure vitally affecting substantive rights," *Id.* (citing *In re Flora Mir Candy Corp.*, 432 F.2d 1060, 1062 (2d Cir.1970)), and admitted that "[t]he sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors," *Id.* Accordingly, while the Court will use the *Augie/Restivo* factors to assess the sufficiency of Munford's allegations, it is not inclined to adhere to these factors as iron-clad rules, especially at this stage before the veracity of the allegations has been tested.

This Court does not think that harm to unsecured trade creditors should be dismissed so easily, but finds that the allegations regarding secured lenders in the present case also support substantive consolidation. Unlike in *Augie/Restivo*, the lenders in this case were aware of the interrelationship of Munford and TOC. Citicorp, the Munford lender, knew of Panfida Group's desire to have Munford's executive officers direct TOC, to have MMMC provide management services to both Munford and TOC, to operate the stores of both Munford and TOC under the "Majik Market" tradename, and to merge Munford with TOC as soon as possible. Although there are no specific allegations regarding the understanding of Bankers Trust Company, TOC's lender, it is alleged that Citicorp's consent to the above conditions was necessary before the closing of the TOC acquisition, and it could be construed from the allegations that the conditions were a part of the TOC deal that was agreed to by the TOC lender. Therefore, it would be a fair assumption from Munford's pleadings that the lenders did not rely on the separate identity of the companies when they extended credit.

Moreover, it appears that Citicorp would not obtain undue priority over Bankers Trust Company in TOC's assets because both lenders' debts remain secured, and both lenders also stand to benefit from a successful reorganization, based on Munford's allegation that its ability to reorganize on its own is questionable. The impact of consolidation on the chances for successful reorganization is another well-used criterion to justify substantive consolidation, *see In re F.A. Potts & Co., Inc.*, 23 B.R. 569, 573 (Bankr.E.D.Pa.1982); *In re Vecco Constr. Ind's., Inc.*, 4 B.R. 407, 410–11 (Bankr.E.D.Va.1980); *In re Commercial Envelope Mfg. Co.*, 3 BCD 647, 650–51 (Bankr.S.D.N.Y.1977), and in this case it favors consolidation.

B. Whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.

According to the Second Circuit Court of Appeals, substantive consolidation should be used only after it has been determined that all creditors will benefit because the untangling of affairs is either impossible or so costly as to consume all of the remaining assets of the estate, *Augie/Restivo*, 860 F.2d at 519. In *Augie/Restivo*, the Court assessed the evidence of commingled assets and business functions and concluded that it did not approach the level of "hopeless obscurity" required under this standard, *Id.* at 519; *see In re DRW Property Co.*, 54 B.R. 489, 496 (Bankr.N.D.Tex. 1985). At this stage of the proceedings, this Court cannot conclude that the same is true in this case. According to Munford, contracts were entered by Munford, TOC or MMMC for the benefit of both Munford and TOC; funds were advanced and received by MMMC and allocated in a way that had little or no relationship to the actual benefit or burden to the respective parties; and intercompany balances of several million dollars were established as directed by MMMC to allocate revenue or expenses between Munford and TOC. Munford also alleges that key records and documents regarding these intercompany balances are outside of its possession or control, that as a result Munford cannot prepare with confidence independent financial statements and would incur "significant expense" to determine the separate financial conditions of the three companies, and that the business functions of the companies cannot be separated without a physical division of their operations resulting in lost economies of scale in vendor contracts and increased operating costs. It can be reasonably inferred from these allegations that the untangling of affairs may be impossible or may be so costly as to consume all of the remaining assets of the estate, and the Court shall not dismiss the complaint on these grounds without a further examination of the facts behind the allegations.

### III.

In addition to challenging the sufficiency of Munford's allegations in support of substantive consolidation, Defendants question this Court's authority to consolidate a debtor's assets with those of a nondebtor. The

foundation for such a consolidation was established by the United States Supreme Court in *Sampsell v. Imperial Paper Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293, *reh'g denied*, 313 U.S. 600, 61 S.Ct. 1107, 85 L.Ed. 1552 (1941), which affirmed the bankruptcy referee's decision to bring into the bankruptcy estate the property of a nondebtor "alter ego" corporation, and by the Second Circuit Court of Appeals in *Soviero v. Franklin Nat. Bank*, 328 F.2d 446 (2d Cir.1964), which held that nondebtor affiliate corporations were instrumentalities of the debtor and therefore their separate corporate entities should be disregarded. *See also In re Crabtree*, 39 B.R. 718 (Bankr.E.D.Tenn.1984); *In re 1438 Meridian Place, N.W., Inc.*, 15 B.R. 89 (Bankr.D. D.C.1981). The fact that these cases were decided under the "instrumentality" theory does not diminish their importance in the present substantive consolidation action because, while they relied on different grounds for consolidation, the cases authorized the same remedy as is requested in the present case: the transfer of a nondebtor's assets into the debtor's estate. For this reason, the District Court in *Tureaud* approved of the Bankruptcy Court's decision to bring a nondebtor's assets into the bankruptcy estate even though it did not find that the nondebtor corporation was not formed for the purpose of hindering, delaying and defrauding creditors, 59 B.R. at 973. The Bankruptcy Court's authority to do this was grounded in § 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a) (1990); *Tureaud*, 59 B.R. at 975.

Defendants argue that § 105(a) is not so broad as to include such an extreme remedy, and that absent clear evidence of Congressional intent to fashion a new remedy in that Code section, one must conclude that Congress provided exclusive express remedies in the Code itself. The fact that § 303 provides a method of bringing a nondebtor into the jurisdiction of the Bankruptcy Court supports this view, according to Defendants, but § 303 provides strict restrictions on bringing in a nondebtor: the nondebtor must be insolvent, and the involuntary petition must be brought by three creditors with noncontingent claims. It is argued that to allow an easier method of bringing in a nondebtor and thus circumventing these strict requirements would be in contravention of § 303 and therefore not within the scope of § 105(a).

This is an extremely limiting interpretation of the reach of § 105(a), which grants general equitable powers to the Bankruptcy Courts. Implicit in this concept is the fact that the Court can fashion remedies where none exist at law as long as these remedies do not contravene the Bankruptcy Code, *In re Executive Office Centers, Inc.*, 96 B.R. 642, 648 (Bankr.E.D.La.1988). Substantive consolidation itself is "entirely a creature of court-made law," *In re Parkway Calabasas Ltd.*, 89 B.R. 832, 837 (Bankr.C.D.Cal.1988), yet courts recognize it as a valid application of § 105(a), *Id.; Baker & Getty Fin. Serv.*, 78 B.R. at 141; *Tureaud*, 59 B.R. at 975; *F.A. Potts*, 23 B.R. at 571.

■ Moreover, in the present context the substantive consolidation of a nondebtor's assets with those of a debtor is substantially different from the involuntary petition remedy of § 303; and, therefore, it does not circumvent the requirements of that provision. Creditors of a financially troubled entity file an involuntary petition in order to create an estate in Bankruptcy Court from which they can satisfy their debts. In this case, Munford, who is not a creditor of TOC, filed this substantive consolidation complaint in order to bring TOC's assets into its own estate to facilitate its own reorganization, not to create an independent bankruptcy estate for TOC. Finally, TOC is not an insolvent entity whose financial affairs need to be managed by the Court. In fact, the insolvency requirement of § 303 would subvert the entire purpose of substantive consolidation in this case, which is to recover assets from a financially sound affiliated entity. Substantive consolidation, therefore, must be considered as a remedy which is entirely independent of, and indeed inconsistent

with, the involuntary petition remedy. Accordingly, it is recognized as an alternative means to bring a nondebtor's assets into a debtor's estate, *see Crabtree,* 39 B.R. at 718; *Meridian,* 15 B.R. at 89.

 Defendants are correct in asserting that any such remedy must be predicated upon the estate's right to property in the hands of someone else. That right is created by Bankruptcy Code § 541, however, which provides that property of the estate includes all legal and equitable interests of the estate, 11 U.S.C. § 541(a)(1) (1990), and § 542, which requires that all estate property must be turned over to the trustee, 11 U.S.C. § 542(a) (1990). Substantive consolidation is essentially a complex turnover proceeding because the debtor is asking the nondebtor affiliated entity to bring into the estate assets in which the debtor asserts an unseparable interest. As long as the debtor can satisfy the pleading requirements of substantive consolidation, i.e. that assets are commingled and unseparable or that creditors have relied on the entities as a single unit and that assets should not be separated, then the debtor has correctly invoked its legal rights under these Code sections.

Defendants present only two cases in which the Bankruptcy Court did not approve the consolidation of a debtor's assets with those of a nondebtor. In *In re Alpha & Omega Realty, Inc.,* 36 B.R. 416 (Bankr. D.Idaho 1984), the Court ruled that a debtor corporation could not be consolidated with a nondebtor affiliated partnership. That Court relied on Bankruptcy Rule 1015(b), however, which governs administrative consolidation; the Advisory Committee Notes to this Rule specifically preclude the application of the provision to substantive consolidation. This is because the purpose of joint administration is simply to make case administration easier and less expensive, and it does not affect the substantive rights of the parties, unlike substantive consolidation, *Parkway Calabasas,* 89 B.R. at 836–37. Additionally, the Court in *Alpha & Omega* stated that

> I also question the conclusion of [the Bankruptcy Court in *Meridian* ] that

nondebtor parties can essentially be declared involuntary debtors through use of a "veil piercing" theory, especially when raised by motion and not through either an adversary proceeding or involuntary petition under § 303 with their attendant protections.

36 B.R. at 417. This statement indicates that the Court relied on the fact that the consolidation action was initiated as a contested matter under Bankruptcy Rule 9014 rather than as an adversary proceeding. It also indicates that the Court recognized that a complaint for substantive consolidation brought pursuant to Bankruptcy Rule 7001, like the one filed in the present case, was a viable alternative to an involuntary petition under § 303.

Finally, in *DRW Property,* 54 B.R. at 489, the Court did not permit consolidation of eighty-five debtor partnerships with one hundred and nine related nondebtor partnerships, stating that it was unaware of statutory or common law authority to consolidate debtor and nondebtor partnerships, *Id.* at 497. In the face of the case law cited above, this opinion is not particularly persuasive, and leads one to query whether the decision turned on the fact that the parties were partnerships rather than corporations. In any event, this Court concludes that the cases support its authority to substantively consolidate the assets of a debtor corporation with those of a nondebtor corporation.

Accordingly, it is ORDERED that Defendants' Motion to Dismiss is DENIED.

IT IS SO ORDERED.