In re Hugo V. OLSON and Jeraldine T. Olson, Debtors.

Bankruptcy No. 6–91–732.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Feb. 22, 1996.

Barbara Olson, St. Paul, MN and David Velde, Alexandria, MN, for Debtors.

Richard Holper, Holper, Welsh & Mitchell, Minneapolis, MN, for Movant.

Wayne Drewes, Fargo, ND, Trustee.

## ORDER

DENNIS D. O'BRIEN, Chief Judge.

This matter was heard on November 29, 1995, on motion of Viking Associates, L.L.C., for an order: vacating a prior order that directed the clerk not to transfer certain claims on the claims register to Viking Associates, as assignee; determining that the assignments are valid and enforceable; and, permitting Viking to enforce the claims in their face amounts. Trustee Wayne Drewes and U.S. Trustee Barbara Stuart objected. Richard Holper appeared on behalf of Viking Associates; Kip Kaler appeared on behalf of Trustee Wayne Drewes; and, Michael Fadlovich appeared on behalf of U.S. Trustee Barbara Stuart. The Court, having heard and considered the evidence produced at the hearing; having reviewed the briefs of the parties; and being fully advised in the matter; now makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

## I.

### STATEMENT OF THE CASE

This dispute arises out of a struggle between Trustee Wayne Drewes and the Debtors' children over the estate's only asset, a minority partnership interest in a partnership known as the Viking Plaza Shopping Center Partnership. Until recently, the estate owned a 38.8 percent interest in the Partnership. The parties had been negotiating a sale of the interest by the estate to the Olson children for over three and one-half years, from filing of the case in November of 1991, until December of 1995. Both sides bargained hard, the estate always demanding more than the Olson children were willing to pay. The Olsons' "final offer", made on November 22, 1994, through their corporation, Viking Associates, L.L.C., was valued at $277,220. The offer was rejected. On December 8, 1994, Trustee Wayne Drewes terminated the negotiations, by letter from his attorney.

In January of 1995, Viking Associates began the global purchase of unsecured claims in the estate. On July 20, 1995, the corporation, asserting that it held the entire unse-

cured creditor constituency, by assignment of claims, filed a joint motion with Debtor Jeraldine Olson for dismissal of the case.[1] Timely filed unsecured claims totaled approximately $525,500. All unsecured claims, filed and unfiled, were purchased for a total of $67,000. At hearing on August 23, 1995, the Court declined to dismiss the case, and ordered that Viking Associates not be substituted as the holder of the claims on the claims register by the clerk, pending further order.

On October 25, 1995, the Court approved the sale of the estate's interest in the Viking Center Shopping Plaza to a third party for $455,000. Viking Associates unsuccessfully bid in $445,000 in connection with the sale.

On November 29, 1995, the Court held an evidentiary hearing on the validity of the assignments of claims purchased by Viking Associates earlier in the year. This Order is issued as a result of that hearing. The Court finds that Viking Associates purchased the claims in an overreaching attempt to interfere with the administration of the estate; and, through the dissemination of false, misleading and incomplete information to creditors, whose claims were purchased.

The Court concludes that the assignments should be allowed only as partial assignments, measured by the amounts actually paid by Viking Associates; and, that the assigned portions of the claims should be subrogated to the payment of the unassigned portions.

## II.

### THE BARGAINING PROCESS

Hugo and Jeraldine Olson filed their joint petition for relief under 11 U.S.C. Chapter 7 on November 25, 1991. At filing, each held an interest in the Viking Shopping Center Plaza Partnership. The partners were:

| | |
|---|---|
| Hugo Olson | 40.8% |
| Jeraldine Olson | 38.8% |
| Robert Froeming | 5% |
| Janice Froeming | 5% |
| Gregory Olson | 2.6% |
| Barbara Olson | 2.6% |
| John Olson | 2.6% |
| Mary Olson | 2.6% |

1. Hugo Olson died on July 7, 1995.

The capital account of Hugo Olson was overdrawn by more than $2,500,000. Trustee Wayne Drewes abandoned the estate's interest in the Partnership, represented by the Hugo Olson share, because he determined that the estate could only suffer adverse tax consequences through any other disposition of the interest.

Mr. Drewes secured an appraisal of the underlying asset of the Partnership, a shopping center in Alexandria, Minnesota. From the appraisal, he determined that the value of Jeraldine's interest was as high as $622,000. Mr. Drewes concluded that the estate could net as much as $437,000, after taxes, from a sale of the interest.

By letter of September 22, 1992, Mr. Drewes offered to sell Jeraldine Olson's interest to the Partnership, or to any of the individual partners, for the sum of $622,000. The Partnership responded on December 3, 1992, through its legal counsel, who suggested that Jeraldine's interest appeared inflated, due in large part to tax errors dating back to at least 1986. Counsel for the Partnership suggested that the interest was worth substantially less than Mr. Drewes thought, and that it might have no value at all.

In the spring of 1993, the Olson children, except Barbara, offered to acquire the Jeraldine Olson interest from the estate for $235,000 in deferred payments. According to Mr. Drewes, Barbara and her father, Hugo, wished to dissolve the Partnership, and did not support the proposed sale. According to the Olson children, Mr. Drewes accepted the $235,000 offer, but the transaction did not close because Mr. Drewes changed the dynamic of the deal by inserting a provision in the transaction documents that would have prevented any distributions until the $235,000 was paid in full. In any event, the deal was not consummated; nor was the Partnership dissolved.

By 1994, the Olson children were united in their resolve to acquire the Jeraldine Olson 38.8% interest in the Partnership from the estate. They sought to purchase the interest that year through their wholly owned corporation, Viking Associates, L.L.C.

On April 12, 1994, Viking Associates offered to purchase the Jeraldine Olson interest for $175,000 cash. Mr. Drewes did not accept the offer. In June, Viking Associates increased the offer to $235,000; payable by $175,000 in cash at closing, and the balance in deferred payments over one year. Again, Mr. Drewes declined acceptance.

On September 22, 1994, Viking made another offer. Viking offered to purchase the interest for $285,000; payable by $200,000 cash at closing, and the balance on or before October 1, 1996. Mr. Drewes responded on October 10, 1994, with a counter-proposal. The estate offered to sell the Jeraldine interest to Viking Associates for $310,000; payable by $225,000 cash at closing, and the balance on October 1, 1995. The proposal contained this important additional provision:

> Any income of the partnership generated in 1994 must be entirely attributable to the other ownership interest. If this cannot be done, we will need a larger purchase price in order to compensate for the additional income taxes the bankruptcy estate will incur.[2]

*(Exhibit x)*

Viking Associates declined the counter-proposal on October 18, 1994, and made yet another offer to purchase the Jeraldine Olson interest in the Partnership for $267,000 cash, payable at closing. Mr. Drewes again declined acceptance. Then, on November 22, 1994, Viking Associates offered to purchase the interest for $265,000 cash, plus twenty-five percent of the estate's tax obligation for the year 1994, attributable to the Jeraldine Olson interest's share of net income from the Partnership.[3] Mr. Drewes again declined to accept the offer. According to Barbara Olson, Mr. Drewes demanded an additional $50,000, and assumption by Viking Associates of all 1994 taxable income attributable the Partnership that would otherwise be a liability of the estate.

Viking Associates did not respond. On December 8, 1994, Mr. Drewes withdrew all pending offers. He also notified Viking Associates that:

> Before we will consider any further offers from [Viking], the bankruptcy trustee insists upon specific proposal with all details and a complete financial disclosure as to the present status of the partnership operation, including its relations with Viking Associates. This would include, but is not limited to, a current profit and loss statement, cashflow statements, and a current and accurate statement of accounts receivable, accounts payable and all other contingent and/or intangible receivables or payables.

*(Exhibit 29)*

On April 18, 1995, after he had received copies of the year-end financial statements for the Partnership pertaining to the 1994 taxable year, Mr. Drewes offered to sell the Jeraldine Olson interest in the Partnership to Viking Associates for $410,000. The offer was again conditioned upon the assumption by other Partnership interests, of all Partnership income for the year 1995. Mr. Drewes notified Viking Associates that:

> [He] would like a response to this in the next ten days. His proposal is subject to bankruptcy court approval, and Mr. Drewes is at this time approaching outside

---

2. All of the net income from the Partnership was used to pay down Partnership secured debt. There were no distributions made to partners, but each partner's capital account was credited the partner's share of net income. This constituted realization of taxable income by the individual partner for the tax period in which the capital account was credited. Mr. Drewes had claimed off-setting net operating losses from prior years against this taxable income for the taxable years 1992 and 1993. No off-set was available for the year 1994. Mr. Drewes claims that important financial information regarding the Partnership, including income and expenses, was wrongfully withheld from him by the Partnership; thereby interfering with his ability to prop-

erly assess these offers. According to Mr. Drewes, the only Partnership financial information that he was able to obtain were the annual financial statements. They were issued several months after the close of the fiscal period to which they pertained. Mr. Drewes blames Viking Associates, manager of the Partnership, for refusing to provide him current financial information.

3. The offer was worth $277,220, because the total income tax liability of the estate attributable to the Jeraldine Olson interest in the Partnership for 1994 was $48,882. Viking offered to pay twenty-five-percent, or $12,220.

persons who have shown interest in buying portions, or all of the partnership assets or interest.

*(Exhibit CC)*

Unknown to Mr. Drewes, Viking Associates had long since abandoned its attempt to acquire the Jeraldine Olson interest from the estate. The Olson children had decided on a radically different strategy to obtain the interest.

### III.

### ASSAULT ON THE ESTATE— THE PURCHASE OF CLAIMS AND MOTION TO DISMISS

The only significant assets in the bankruptcy case, when filed in November of 1991, were the Hugo and Jeraldine Olson interests in the Viking Plaza Shopping Center Partnership. Trustee Wayne Drewes abandoned the Hugo Olson interest early in the case. By January of 1995, the only asset remaining was the Jeraldine Olson interest in the Partnership.

In January, the Olson children decided that they would take control of the estate, through the acquisition of unsecured claims. All scheduled debts in the case were business debts, except for the Olsons' home mortgage. By January of 1995, unsecured claims on file totaled $525,428.00.[4] There were no secured claims.

Once they held the claims, the Olson children planned, with the cooperation of their mother, Jeraldine Olson, to seek dismissal of the bankruptcy case. They intended to acquire the Jeraldine Olson interest in the Viking Plaza Partnership directly from her.

Between January and July 20, 1995, Viking Associates, through its legal counsel, purchased all unsecured claims connected with the case, filed and unfiled, from twenty creditors, for the total amount of $66,945.00. On July 20, 1995, Viking Associates and Jeraldine Olson filed their motion to dismiss the bankruptcy case. The parties recited, in a stipulation filed with the motion, that:

Jeraldine Olson intends to and will be transferring the [Jeraldine Olson Partnership] interest currently held by the Trustee to Viking Associates, LLC, some day, after the dismissal of this case. She intends to transfer her interest in the [Jeraldine Olson Partnership] interest to Viking Associates, LLC, in gratitude for their assistance in dismissing this case, for the financial and emotional support they have provided, and simply because they are my children.

The motion to dismiss was denied at hearing, on August 23, 1995; and, the clerk was ordered not to substitute Viking Associates as holder of the claims on the clerk's claims register, pending further order of the Court.

### IV.

### THE SALE

In September, 1995, Trustee Drewes filed a motion for sale of the Jeraldine Olson Partnership interest to a third party for $325,000. Hearing was held October 25, 1995, on the motion. Viking Associates had objected to the sale, and bid in an offer of $445,000 at the hearing, payable in cash. The Court approved the sale of the Jeraldine Olson interest to the third party for $455,000.

Mr. Drewes testified that the following accounting will likely result from the sale:

| | |
|---|---:|
| gross proceeds | $455,000 |
| 1995 income taxes | − 124,750 |
| 1994 income taxes | − 48,882 |
| net to estate | $281,368 |
| priority claim, MN | − 1,269 |
| trustee fees and exp. | − 14,250 |
| est. acct. and legal | − 40,000 |
| distribution to unsec. creditors | $225,849 |

### V.

### THE PURCHASE OF CLAIMS REVISITED–EVIDENCE AND FINDINGS

*Olsons' Explanation, The General Theme.*

The Olson children assert that their dealings with the estate and creditors were al-

---

4. TCF filed an unsecured claim for $1,814,-850.00; but, no one seriously considered the claim to be unsecured. *See:* ftn. 13. The TCF claim was fully secured by a second mortgage on Viking Plaza Shopping Center Partnership real estate. The TCF claim that was filed in the Olson bankruptcy, as an unsecured claim, was based on a personal guaranty of the Olsons' on Partnership secured debt; and, it was a contingent claim.

ways in good faith; both when seeking to acquire the Jeraldine Olson Partnership interest from the estate, and, later, in purchasing the unsecured claims. They attribute any apparent deficiencies in their offers to the refusal by Trustee Drewes to furnish them important financial information concerning the estate. The Olson children explain that "the information was crucial and needed by the Olsons both to formulate offers to acquire the interest of the estate and in establishing what they would bid to acquire the claims."[5] According to Viking Associates, the offers made to the estate and creditors were the results of reasonably based, good faith, arms-length bargaining under the constraints of limited information. Crucial information, they say, was wrongfully denied them by Trustee Drewes.

### Controversy In Search Of An Issue.

■ Viking Associates had been seeking financial information concerning the estate, from at least June of 1994, through the corporation's acquisition of the claims in 1995. The estate refused to furnish the information, especially regarding estate income tax.

According to Viking Associates, a verbal request was made to Trustee Drewes in June 1994, for estate income tax information, which was not provided. Sometime later, Mr. Wentzell contacted U.S. Trustee Barbara Stuart, by letter to Michael Fadlovich, her attorney, advising of the failure; and, apparently seeking assistance in securing the information. Kip Kaler, Mr. Drewes' Counsel, responded, by letter dated December 30, 1994, to Mr. Wentzell. The letter contained this excerpt:

> [If] you represent a creditor, you are certainly entitled to certain information from Mr. Drewes, which he will readily supply. However, if you are merely representing Barbara Olson, the Olsons, or Viking Plaza, I believe your interest is far different. If you believe one or more of those entities has a claim against the bankruptcy estate, please provide that information as well. (Exhibit 30)

Mr. Wentzell replied, by letter of January 10, 1995, wherein he said:

> The key issue is taxes. Where is the estate going to obtain the money to pay the accruing taxes? This estate has been open 3 years and obviously 3 years of tax returns are due. In some years monies were and are owed. Leaving the estate open only injures it by the ever increasing administrative expenses.
>
> [To] the extent you have to pay those obligations you cannot pay the creditors. I don't want my clients' payments being diminished because of taxes owing.
>
> That was my reason for contacting Mike Fadlovich. I thought Mike Fadlovich would help educate the estate in regard to tax issues and their adverse consequences on unsecured creditors. I have been contacted by a creditor other than Viking Plaza to review this matter.[6]

(Exhibit 1)

The letter was not well received. Mr. Kaler responded by letter, dated January 16:

> Your letter of concern dated January 10, 1995 is unconvincing. I do not know that the Olsons have any interest in the bankruptcy estate and the bankruptcy estate is not going to provide them the type of information being requested.

(Exhibit 31)

On February 28, 1995, Debtor Jeraldine Olson, by letter to Mr. Drewes, requested copies of the 1991, 1992, and 1993 estate tax returns.[7] Mr. Drewes offered to provide the information to her, if Mrs. Olson would agree to a court order directing that she keep the returns confidential from her children.[8] Apparently, Mrs. Olson did not agree to the condition, because the matter was not resolved.

By letter dated May 23, 1995, to Mr. Kaler, Mr. Wentzell assured him that:

---

5. *Viking Associates, L.L.C.'s Post Hearing Memorandum,* ftn. 6, p. 4.

6. Mr. Wentzell was unable to recall who the creditor was, when asked at the hearing.

7. *Motion To Limit Release Of Information,* filed June 7, 1995, *Exhibit C.*

8. *Id., Exhibit D.*

[Contrary] to what you believe, Viking Plaza is interested in the Jeraldine Olson's Estate financial condition for purposes of refinancing the shopping center.

*(Exhibit 5)*

On June 7, 1995, Trustee Drewes filed his *Motion To Limit Release Of Information,* wherein he requested that:

[the] court issue an Order the trustee is not to furnish any financial statements or tax returns of the bankruptcy estate, to Jeraldine Olson, any of her children, Viking Plaza Shopping Center Partnership, nor the agents or attorneys of any of those persons or entity, nor any other person, who seeks to obtain such information for any of those persons.

In his brief, filed with the motion, Mr. Drewes argued:

[In] a nutshell, the trustee's concern is that a concerted effort is being put forth by the "non-bankrupt" partners to put under pressure upon [*sic*] the trustee to sell the estate's interest in the Viking Plaza Shopping Center Partnership to them at a price substantially lower then [*sic*] fair market value.

[Another] matter of concern to the trustee in this light relates to the apparent attempt on the part of the "non-bankrupt" partners of the Viking Plaza Shopping Center Partnership to purchase claims of creditors in the debtors' estates.... it is the concern of the trustee that the reason such claims are being sought is so these partners may become "parties in interest" to the estate. If this occurs, the trustee would assert that these newly converted "parties in interest" be required to establish the standard of "good cause" before the requested information is released.

Viking Associates and the Olson children filed their *Creditors And Olsons' Response To The Trustee's Motion To Limit Release Of Information,* on July 20, 1995. Following, is an excerpt from the *Response:*

[Viking] Associates, LLC is a limited Liability Company composed of the four Olson children, Barb, John, Greg, and Mary Olson. They own all of the creditors claims. They need to know how the trustee is operating its estate. Is it paying its taxes? Is it incurring unnecessary costs in holding open the administration of this estate? Is it incurring unnecessary professional fees (lawyers, accountants, appraisers) without any action being taken? Is the time price of money eating away the value of the Jeraldine Olson interest?

On that same day, July 20, 1995, Viking Associates filed its *Motion To Approve Stipulation For Dismissal Of Chapter 7 Bankruptcy,* and *Motion For Continuance Of The Trustee's Motion To Limit Release Of Information.* Viking Associates requested that the motions be consolidated for hearing on August 23, the date set for its *Motion for Dismissal.*

Mr. Wentzell disclosed to Mr. Kaler, by letter dated August 9, 1995, that:

[The] reason everyone was requesting financial information from the Trustee regarding the financial condition of the Jeraldine Olson estate was so that a fair and equitable offer could be made to purchase the claims of the creditors.

*(Exhibit 9)*

The issue between the estate and Viking Associates, pertaining to the bargaining process, was the market value of the Jeraldine Olson Partnership interest; not some other value to the estate, net of income taxes or other administrative expenses. The financial information that Viking sought from the estate might have provided the Olsons some strategic value in the price negotiation. But, the information had no demonstrated connection with market value of the Jeraldine Olson Partnership interest. Viking Associates, as prospective purchaser, had no more right to such information than the estate had right to information from Viking Associates, concerning how much the corporation could afford to pay for the interest.

Financial information of the estate was, of course, pertinent to the global purchase of unsecured claims. But, Viking Associates did not disclose to the estate that it was engaged in the global purchase of claims until after the claims had been purchased. Apparently, Mr. Drewes learned in May of 1995, that Viking Associates was purchasing claims. However, when he filed his *Motion*

*To Limit Release Of Information* in June, Mr. Drewes was still under the impression that selected claims were being purchased by Viking Associates to leverage entitlement to estate financial information that he had refused to provide. There is no indication in the record that Drewes was aware of the global purchase of claims by Viking Associates before the July 20, 1995, filing of the *Motion For Dismissal.* Mr. Wentzell did not disclose that the information had been sought in connection with claims purchases until August 9, 1995. Prior to the disclosure, he had consistently claimed that the information was being sought for other purposes.

Finally, the difference between actual and represented estate income taxes, did not significantly affect the dynamic of the purchase of claims offers. Mr. Wentzell testified that, in determining the total amount to be paid for all the claims, he and the Olson children estimated the amount that would otherwise be available for distribution to unsecured creditors; assuming a sale of the Jeraldine Olson Partnership interest. According to Mr. Wentzell, they started with Viking Associate's last cash offer of $265,000, and reduced the figure by estimated amounts for taxes. A reduction of $60,000 was made for estimated income taxes, through 1994. Actual taxes were $48,882. The impact of the erroneous $61,500 tax estimate was only $12,618.

In summary, the Olsons neither needed, nor were entitled to receive, financial information of the estate in connection with negotiating the purchase of the Jeraldine Olson Partnership interest. They did not request the information in connection with their global purchase of claims; and, the information, even if known to them, would have had little effect on the purchase offers made to creditors.

The dispute, raised by the Olsons as evidence of their good faith, presents a controversy without issue pertaining to this proceeding.[9] The actual solicitation of creditors and the purchase of claims by Viking Associates, present a more appropriate focus.

### Solicitation of Creditors.

Viking Associates solicited the unsecured creditors toward the purchase of their claims through the corporation's counsel, Joseph Wentzell. Mr. Wentzell contacted the creditors, either through their attorneys or directly, both by phone and by letter. The following excerpt from a letter of March 22, 1995, by Mr. Wentzell to attorney Michael Hannaher, who represented at least four creditors holding substantial claims, is typical of Mr. Wentzell's approach to the more sophisticated creditors:

> This letter is an outline by which my clients intend to bring finality to this unending and raucous process. I have addressed this letter to you as the creditor and as representative of other creditors. The numbers set forth below are my best estimates.
>
> [Currently] there are approximately 18 claimants in Jeraldine's bankruptcy.... The total [claims] that we would have to deal with is $526,722.00.
>
> The only asset of any value is her partnership interest in Viking Plaza Shopping Center Partnership. It is a family held partnership with a majority being held by the Olson family members even after excluding Jeraldine's interest which is now owned by the Trustee.
>
> Based on the best case scenario, the interest could be sold for $250,000.00 assuming a robust Alexandria area economy and the purchaser is friendly to the Olson partners. Or, better stated that the Olsons "liked" the buyer. Who wants to own a minority interest in any family owned partnership? The other value used is the one derived from a now robust economy and an outside minority approach which then would give a value of $100,000.00 to Jeraldine's interest. Take a middle approach and say it is worth $175,000.00.[10]

---

9. If evidence of anything, the dispute over access to estate information is more persuasive evidence of bad faith on the part of the Olsons, since Mr. Wentzell consistently misrepresented to the trustee the reasons why he sought the information.

10. Mr. Wentzell did not mention in the letter that Trustee Drewes' last demand was for $310,000, plus the 1994 tax liability; or, that Viking Associates had made an offer, valued at $277,220.

Assume the Trustee recovers from the estate $175,000.00 from the partnership interest. This will result in taxable gain of about $120,000.00. The Trustee has certain basis which causes the reduction. The Trustee must pay taxes on that at the rate of approximately 38% between state and federal income taxes. Based on 38% of the $120,000.00 the Trustee would be incurring a tax bill of $45,000.00. The Trustee has been receiving some benefits each year from the partnership which it has had to pay income taxes on and to date we believe they were not paid because the Trustee has had no income to pay it. There has been taxable income to the Trustee of $29,700.00 for 1992 and $90,550.00 for 1993 and approximately $94,375.00 for 1994 which would mean he has a State and Federal tax bill of approximately $61,500.00.[11] The Trustee would then have, depending upon the numbers used, less than $70,000.00 to distribute.

[Let] us assume that all of his taxes are current except for those that will arise from the sale of the partnership interest, one must ask how much is he paying his attorney and his accountant and himself as trustee of this case. What will he charge for the future services or future taxes owing?

Based on the above and the personal reasons to my clients they are willing to pay your group between 8.5 and 10% of their claims . . .

*(Exhibit 2)*

Mr. Wentzell later wrote another attorney, on May 24, 1995, referring to the above information:

11. Reference to the existing tax liability of $61,500 was incorrect. The 1994 estate income tax liability was $48,882.

12. The Olson children were aware that Trustee Drewes had secured an appraisal in 1992. Mr. Drewes' initial offer to sell the Jeraldine Olson interest for $622,000 to the Partnership was explicitly based on the appraisal.

13. The inference that there would be a pool of creditors totaling more than $5,000,000 in claims to share any estate dividend was false. In connection with the later motion to dismiss the case, each of the Olson children signed an affidavit stating that Viking Associates had purchased

[In] that letter I talked about handling the issues as they relate to Jeraldine and her creditors. We kept Hugo out of the equation.

Now, the Trustee has told you the estate's interest in the Partnership is worth $500,000.00 to $600,000.00. . . . There has not been an appraisal.[12] The Trustee has not had anyone interested in purchasing the partnership interest. The only one who has made an offer in the last 3½ years is the family. The Trustee's estimate of value is wildly exaggerated.

The Trustee says the interest is so great let us take the average of the two values. The value would be $350,000.00. My April 19th calculations utilized only Jeraldine's debts. You know that Hugo's and Jeraldine's total debts are over $5,000,000.00. This is a jointly administered bankruptcy. The money from Jeraldine's interest must be shared with Hugo's creditors after all taxes, administrative expense are paid. How much would the Banks get if they have to do that and when will it receive the money? . . .[13]

*(Exhibit 6)*

Other creditors received less detailed solicitations. One creditor, Del Kundert, holder of an unsecured claim in the amount of $12,000.00, received this pitch in a letter from Mr. Wentzell, dated May 15, 1995:

I represent the Olson children who want to help end their parents' bankruptcy. They want to buy your claim, so they can move to dismiss their bankruptcy. Hugo is now in a rest home. The Olsons are divorced. Jeraldine is living alone in an apartment in Alexandria. They have IRS problems. I

"all of the creditors claims in the bankruptcy estates of Hugo and Jeraldine Olson." A stipulation filed with the motion listed the claims. The difference between the $526,722 and $5,000,000 mentioned in Mr. Wentzell's two letters, represented fully secured contingent claims that were identified in paragraph 8 of the stipulation. Viking Associates quite properly took the position, in connection with the dismissal proceeding, that those claims would not be entitled to distribution; and, that failure to acquire the secured contingent claims did not undermine Viking Associates' assertion that it held the entire unsecured claims constituency of both estates.

am in the process of making an offer in compromise on their behalf to the Internal Revenue Services to settle their tax problems. They are living on social security. Their lives are a mess. We need your help....

*(Exhibit J)*

And, attorney Tim Davies, whose firm was owed $23,000, was told by Mr. Wentzell in a letter, dated May 8, 1995:

[As] you know Hugo filed bankruptcy in 1991. The best I can tell from my investigation of the estate, all real property owned has been foreclosed on and the proceeds have been used to pay the secured creditors.

Hugo had an interest in Viking Plaza Partnership. Because of the negative capital account of over $1,000,000.00 the trustee has abandoned that asset. Quite frankly I don't believe any of the creditors will receive any monies from this case and if they do it wouldn't be but a couple of percentage points based on the trustee's fees being taken first.

Based on the above and our telephone conversation I have enclosed an assignment. In exchange for 5% of your claim, which equals $1,150.00, your firm will be assigning all of ins [*sic*] interests in any claims against Hugo or Jeraldine. You will be receiving the check under separate cover. Upon receipt of the check please sign and return the assignment.

The four Olson children are putting up the money to buy these claims to end this bankruptcy. As I told you, Mr. Olson is divorced and living in the nursing home here in St. Paul and is doing very poorly. Mrs. Olson lives in an apartment in Alexandria. Because of tax consequences I understand Barbara Olson will be preparing an Offer in Compromise on behalf of her mother. They are not going to bother in regards to Hugo.

14. The Bankruptcy Code provides Chapters 11, 12 and 13, for debtors who wish to keep their nonexempt assets through arrangements with their creditors. Those Chapters provide for court supervised procedures, including disclosure and plan confirmation requirements, that must be complied with. The Chapters are designed to assure: the opportunity for full and

If you have any questions call me.

*(Exhibit K)*

### Overreaching Interference With Administration Of The Estate.

Jeraldine and Hugo Olson filed for relief under 11 U.S.C. Chapter 7 on November 25, 1991. They received their discharge on March 18, 1992. Debtors, who file for relief under Chapter 7, surrender their nonexempt assets for liquidation for the benefit of their creditors, including creditors whose debts are discharged. Trustees in Chapter 7 cases have the fiduciary duty to manage and liquidate estates toward maximizing the return to creditors, according to the priority distribution provisions of the Bankruptcy Code. Debtors are required to cooperate with trustees in the administration of their estates toward that end. 11 U.S.C. § 521(3).

Finding of overreaching interference with the administration of a Chapter 7 estate is compelled where, as here, insiders of a discharged debtor:

1) having unsuccessfully attempted to purchase the estate's assets from the trustee; and,

2) having special knowledge of the value of the assets;

3) acquire all claims in the estate for a total amount equal to a small fraction of the value of the assets, for the purpose of joining with the debtor to have the case dismissed so that the assets can be returned to the debtor for later distribution to the insiders.

Such a scheme is overreaching by its very nature; and, its perpetration seriously assaults the integrity of the bankruptcy process itself.[14] In light of its obvious inappropriateness, the brazen manner in which the scheme was undertaken in this case is startling.

informed creditor participation; the debtor's compliance with minimum performance and distribution standards; adherence to priority distribution requirements; equal treatment of like claims; and, generally to assure that the statutory rights of all interested parties are adequately protected.

■ The Olson children knew that the value of the Jeraldine Olson Partnership interest vastly exceeded $67,000. They had submitted an offer in November of 1994, valued at $277,220, to purchase the interest. The Olsons used their relationship with their mother, Jeraldine Olson, to induce her to participate in a scheme whereby they sought control of the estate, at minimal cost, for purposes of obtaining dismissal of the case. The Olsons devised the scheme for their own enrichment at the expense of the estate and creditors, whose debts have been discharged; and, by enlisting Jeraldine Olson, they caused her to breach her duty to cooperate with the trustee in the performance of his duties.

Twenty unsecured claims were purchased by Viking Associates, for a total of $67,000. Of that amount, $25,000 was used to purchase one claim, the unsecured claim of First Bank/Metropolitan, at approximately twenty-five percent of its face value. Mr. Wentzell testified that the First Bank/Metropolitan claim was purchased for twenty-five percent of its face value, because it was the last claim needed by Viking Associates. The other claims were purchased at, from one to ten percent of face value. Trustee Drewes testified that, depending on continuing costs associated with this proceeding, he expects the estate to have available for distribution, forty-two percent of the face value of timely filed unsecured, allowed claims.

If fully enforced, the assignments of claims would result in the enrichment of Debtor Jeraldine Olson and her children, at the expense of unsecured creditors, by as much as $158,849.00; which is the difference between the $67,000 Viking Associates paid for the claims, and the $225,849 that the trustee expects to distribute to the holders of timely filed, allowed claims.[15] Such a result would be unacceptable, regardless of the manner in which the claims were purchased. Here, circumstances were exacerbated by the Olsons

through the use of false, misleading and incomplete information in acquiring the claims.

### False, Misleading And Incomplete Information.

Mr. Wentzell's May 24, 1995, letter to Joseph Truman (*Exhibit 6*), soliciting claims, contained two material falsehoods. One, was that no appraisal had been performed. The other, was that the real size of the pool of claims that would share any distribution would be $5,500,000, rather than $526,772. Information furnished others was materially misleading and incomplete.

For instance, Mr. Wentzell discussed market value of the Jeraldine Olson Partnership interest in his letter of March 22, 1995, to Michael Hannaher (*Exhibit 2*). He explains:

> Based on the best case scenario, the interest could be sold for $250,000.00 assuming a robust Alexandria area economy and the purchaser is friendly to the Olson partners. Or, better stated that the Olsons "liked" the buyer. Who wants to own a minority interest in any family owned partnership? The other value used is the one derived from a now robust economy and an outside minority approach which then would give a value of $100,000.00 to Jeraldine's interest. Take a middle approach and say it is worth $175,000.00.

Mr. Wentzell failed to mention that the trustee had secured an appraisal and believed that the interest was worth as much as $622,000; or, more importantly, that Viking Associates had submitted an offer, valued at $277,220, to acquire the interest. He did not mention that the trustee's last demand was $310,000, plus assumption of 1994 estate income tax liability. In fact, Mr. Wentzell made no mention of Viking Associates past dealings in attempting to purchase the interest from the estate. The suggestion that $175,000 was a reasonable value was, under the circumstances, materially misleading.[16]

---

15. Had the case been dismissed, as requested by Viking Associates and the Olsons, the Olsons would have been enriched by at least $388,000; which is the difference between the $455,000 that the Jeraldine Olson Partnership interest sold for, and the $67,000 that Viking paid for the claims in the estate. Actual enrichment might have been much greater, depending on the true market value of the Jeraldine Olson Partnership interest.

16. Mr. Wentzell testified at the hearing that he actually used $265,000 as the starting figure to calculate an estimated distribution to creditors, in the event of sale of the Jeraldine Olson Partnership interest. That testimony is inconsistent

Lack of detailed disclosure regarding past dealings between Viking Associates and the estate, caused the information that was furnished to be materially misleading in another, more insidious, way. The omission facilitated the presentation of the Olsons as: children on a mission of mercy regarding their parents, on the one hand; and, as champions of the estate and unsecured creditors, on the other hand. Creditors were told that the Debtors were living broken and pitiful lives, which the children sought to mend. (*Exhibits J* and *K*). They were told by Mr. Wentzell, in reference to the bankruptcy case, that: the Olsons "intend[ed] to bring finality to this unending and raucous process" (*Exhibit 2*); "Quite frankly, I don't believe any of the creditors will receive any monies from this case ... The four Olson children are putting up the money to buy these claims to end this bankruptcy" (*Exhibit K*).

The omission of past dealings facilitated the presentation of the trustee as an obstructionist to the resolution of the estate, unnecessarily keeping it open for personal gain at the expense of creditors. Creditors were told that "[t]he Trustee's estimate of value is wildly exaggerated" (*Exhibit 6*); "one must ask how much [the trustee] is paying his attorney and his accountant and himself as trustee of this case. What will he charge for the future services or future taxes owing?" (*Exhibit 2*).

The omission of past dealings between the parties concerning the sale of the Jeraldine Olson interest to Viking Associates, made all of those presentations seem credible. However, past dealings reveal that the Olson children were self-interested in their negotiations with the estate. They had sought to acquire the Jeraldine Olson Partnership interest at the lowest possible cost. Past deal-

ings also revealed that the trustee had bargained aggressively and skillfully, seeking to maximize the return to the estate. In fact, past dealings revealed that the bargaining process had been working exactly the way one would expect it to work; and, that it had brought the parties close to reaching an agreement, when the Olson children abandoned it.

Finally, the general manner in which the purchase of the claims was pursued was misleading. The presentations resulted in confusion, among at least some of the creditors, as to who they were dealing with; and, as to where the money came from that was used to purchase their claims.[17] For instance, Jerome Luther, vice president of unsecured creditor Gate City, testified that he thought that the money received by Gate City was a distribution from the estate. Another unsecured creditor, Merle Skatvold, testified that he did not understand where the money came from or why, but thought that the five percent offered was all that would be available.

In summary, the global purchase of claims was not only ill-conceived; it was also inappropriately pursued. Creditors were furnished false and misleading information; and, important information was omitted. Some creditors were left confused: as to who they were dealing with; where the funds came from that purchased their claims; and, what alternative choices they might have had to accepting the payments.

## VI.

### THE REMEDY

*Who Can Complain.*

F.R.Bankr.Proc. 3001(e)(2) provides:

(e) Transferred Claim.

---

with his letters to Mr. Hannaher, *Exhibit 2*, and to others.

17. The strategy of purchasing claims to take over the estate was secretively pursued, *vis a vis* the estate. It is now clear that Viking Associates was seeking financial information from the estate to facilitate the purchases. But, Mr. Wentzell repeatedly misrepresented to Mr. Drewes the reason for requesting the information, until after the claims had been purchased. And, while Mr.

Wentzell testified that he told all creditors, with whom he dealt, that they should contact the trustee if they had any questions about the information that he furnished them, none of the letters soliciting claims contains that advice. Apparently, only one creditor contacted Mr. Drewes. That resulted in Mr. Wentzell's letter to Joseph Truman, in which he referred to the trustee's estimate of value as "wildly exaggerated". (*Exhibit 6*)

(2) Transfer of Claim Other Than for Security After Proof Filed. If a claim other than one based on a publicly traded note, bond, or debenture has been transferred other than for security after the proof of claim has been filed, evidence of the transfer shall be filed by the transferee. The clerk shall immediately notify the alleged transferor by mail of the filing of the evidence of transfer and that objection thereto, if any, must be filed within 20 days of the mailing of the notice or within any additional time allowed by the court. If the alleged transferor files a timely objection and the court finds, after notice and a hearing, that the claim has been transferred other than for security, it shall enter an order substituting the transferee for the transferor. If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor.

The Rule was amended in 1991 to its present form. Prior to the amendment, the Rule was generally interpreted as requiring courts to issue orders pertaining to all transfers of claims. The amendment was intended to limit the court's role. The *Advisory Committee Note* (1991), issued in connection with the amendment, provides:

> Subdivision (e) is amended to limit the court's role to the adjudication of disputes regarding transfers of claims. If a claim has been transferred prior to the filing of a proof of claim, there is no need to state the consideration for the transfer or to submit other evidence of the transfer. If a claim has been transferred other than for security after a proof of claim has been filed, the transferee is substituted for the transferor in the absence of a timely objection by the alleged transferor. In that event, the clerk should note the transfer without the

need for court approval. If a timely objection is filed, the court's role is to determine whether a transfer has been made that is enforceable under nonbankruptcy law. This rule is not intended either to encourage or discourage postpetition transfers of claims or to affect any remedies otherwise available under nonbankruptcy law to a transferor or transferee such as for misrepresentation in connection with the transfer of a claim. "After notice and a hearing" as used in subdivision (e) shall be construed in accordance with paragraph (5).

Viking Associates and the Olsons argue that: Rule 3001 governs the transfer of claims; only transferors have standing under Rule 3001(e)(2) to object to transfers; no transferors objected to the transfers in this case; therefore, the Court should not interfere.[18]

■■■ Rule 3001(e)(2) provides a procedure for the handling of assignments of claims, to facilitate the orderly administration of estates.[19] The Rule limits the court's role in that procedure, relieving the court of the *responsibility* to review assignments and issue orders in connection with all transfers. The Rule does not prevent its inquiry into the transfer of claims on its own initiative, where otherwise appropriate in the performance of judicial duties.

■■ 11 U.S.C. § 105(a) provides:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court

---

**18.** The Court issued its order directing that the clerk not substitute Viking Associates as the holder of the assigned claims on the claims register, on the Court's own initiative. Trustee Drewes had not objected to the assignments. The order was issued, based on information learned by the Court at the hearing, and was intended to stay the substitution pending full hearing. The Court was concerned regarding the validity of the assignments, and concluded that the orderly administration of the estate would be better served

if the substitution not be made pending determination of validity.

**19.** Completion of the substitution procedure by the clerk, without objection, does not constitute a determination on the merits of the assignment; nor, does it preclude a later challenge to an assignment by an interested party. It does ordinarily allow for orderly administration of estates, especially in the areas of balloting and distributions.

orders or rules, or to prevent an abuse of process.

Rule 3001(e)(2) does not limit the scope of the court's powers under this section. The Rule is not intended to frustrate the court's performance of the judicial duty to protect the integrity of the bankruptcy process.

■ Even if Rule 3001(e)(2) could be reasonably interpreted to preclude independent judicial inquiry into the transfers of claims under all circumstances, it could not have that effect. Bankruptcy rules of procedure cannot abrogate judicial authority conferred by statute. See: *In Re Falk*, 96 B.R. 901, 903 (Bankr.D.Minn.1989); *28 U.S.C. § 2075*, generally; and, *Legislative History And Comment, 28 U.S.C. § 2075, House Report (Reform Act 1978)* "Rules promulgated under section 2075 will no longer be permitted to be inconsistent with the statute. To the extent a rule is inconsistent, the statute will govern." [20]

■ Accordingly, the authority of this Court to inquire into the circumstances of the purchase of claims by Viking Associates; and, to provide appropriate remedies where necessary to prevent the abuse of process; is not precluded by Rule 3001(e)(2). Appropriate remedies can include complete disallowance of the assignments; or, partial allowance and subrogation. Circumstances compel a remedy in this case; and, partial allowance, with subrogation, is the better one.

### Partial Allowance And Subrogation.

■ Assignments of claims are neither favored nor disfavored under the Bankruptcy Code. Assignments will be allowed at face value of the claims, absent a showing of self dealing, bad faith, misrepresentation, conflict of interest; or, utilization of inside knowledge or strategic position. *Manufacturers Trust Co. v. Becker*, 338 U.S. 304, 70 S.Ct. 127, 94 L.Ed. 107 (1949); *In Re SPM*

*Manufacturing Corp.*, 984 F.2d 1305 (1st Cir. 1993); *In Re Odd Lot Trading, Inc.*, 115 B.R. 97 (Bankr.N.D.Ohio 1990); *In Re Matter Of Executive Office Centers*, 96 B.R. 642 (Bankr.E.D.La.1988). Furthermore, courts have consistently refused to limit an assignee's claim to the discounted purchase price, absent some wrongful conduct that would otherwise provide a legal or equitable basis for judicial interference. *Executive Office*, at 649.

■ However, assignments are subject to disallowance or limitation when they are the result of overreaching; and, where they result in the diminution of the estate. *In Re Matter Of Executive Office Centers*, 96 B.R. 642, 648 (Bankr.E.D.La.1988); *In Re SPM Manufacturing Corp.*, 984 F.2d 1305, 1314 (1st Cir.1993). That is the situation in this case.

■ The global purchase of claims, by insiders of a discharged Chapter 7 debtor, at substantially less than the value of an estate's assets, for the purpose of obtaining dismissal of the case and return of the assets to the debtor; is an overreaching interference with the administration of the estate. Certainly, the purchase of claims under those circumstances, by the debtor, would not be allowed.[21] Such conduct is no more acceptable when engaged in by insiders of a debtor, in concert with the debtor, for their personal gain.

The effect of the scheme, had it been successful in this case, would have been more than to diminish the estate. The effect would have been to terminate the estate, thereby unjustly enriching the Debtor and her children. Recognizing and enforcing the assignments at face value, would reward Viking Associates and the Olsons by permitting them to realize the enrichments derived from the wrongful enterprise. Disallowing, or limiting, the assignments to preserve the integrity of the bankruptcy process, is justified

---

**20.** Although Rule 3001(e)(2) is not a provision of Title 11, and the second sentence of § 105 arguably does not technically apply to proceedings under the Rule; the first sentence of § 105 provides sufficient authority, standing alone, for the Court to inquire into the assignments here, outside the Rule.

**21.** As indicated earlier, a debtor has a duty to cooperate with the trustee in the performance of the trustee's duties. *See:* 11 U.S.C. § 521(3).

regardless of the manner in which the claims were solicited. That the claims were solicited through materially false, misleading, incomplete and omitted information; only makes the need for the imposition of a remedy more compelling.

The most appropriate remedy is to allow the individual assignments only up to the amounts that the claims were purchased for. The partial assignments should then be subordinated to the payment of the unassigned portions of the claims. That will provide the appropriate sanction against Viking Associates and the Olson children for their misconduct; and, will preclude the theoretical possibility that creditors might otherwise receive a double recovery if the assignments be completely disallowed.

## VII.

## DISPOSITION

Based on the foregoing, it is hereby **ORDERED:**

1) The assignments of claims in favor of Viking Associates, L.L.C., resulting from Viking Associates' purchase of the claims of unsecured creditors in this case in 1995, are allowed and enforceable only to the extent of the purchase prices paid for the individual claims.

2) The portions of claims held by Viking Associates, L.L.C., as assignee, allowed and enforceable by paragraph 1 of this Order, shall be subordinated to the payment of the remaining portions of the claims.

3) The clerk shall substitute Viking Associates, L.L.C., as the holder of claims on the clerk's claims register, consistent with this Order.

LET JUDGMENT BE ENTERED ACCORDINGLY.