In re CREDITORS SERVICE CORPORATION, Debtor.

Arnold S. WHITE, Trustee,

and

Consolidated Freightways of Delaware, Inc., Plaintiffs,

v.

CREDITORS SERVICE CORPORATION, et al., Defendants.

Bankruptcy No. 94–50019.
Adv. No. 95–0038.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

May 10, 1996.

 

Arnold S. White, Trustee, Columbus, Ohio.

Grady L. Pettigrew, Arter & Hadden, Columbus, Ohio.

John F. Cannizzaro, Marysville, Ohio, for debtor.

Victoria E. Powers, Schottenstein, Zox & Dunn, Columbus, Ohio.

Frederick M. Luper, Luper, Sheriff & Neidenthal Co., L.P.A., Columbus, Ohio.

Brenda L. Dodrill, Assistant United States Attorney, Columbus, Ohio, for U.S.

Alexander G. Barkan, Assistant United States Trustee, Columbus, Ohio.

## MEMORANDUM OPINION AND ORDER

CHARLES M. CALDWELL, Bankruptcy Judge.

This Memorandum Opinion and Order constitutes findings of fact and conclusions of law for the Amended Complaint to Consolidate filed by Arnold S. White, the Complaint for Substantive Consolidation, Accounting, Money Damages and Other Relief filed by Consolidated Freightways of Delaware, Inc., and the Answers of Creditors Service Corporation, National Creditors Group Corporation, Medical Technical Services, Inc., RKC Development Corporation, Professional Billing Services, and Kathleen Cooley. Mr. White is primarily seeking to substantively consolidate nondebtor entities and an individual with the Debtor, Creditors Service Corporation, and he has been joined in this effort by Consolidated Freightways of Delaware, Inc., that is a substantial creditor and former customer of the Debtor.

The relevant history of this adversary proceeding commences with the incorporation of Creditors Service Corporation ("Debtor") on July 1, 1971. The Debtor was engaged in the collection business, and was originally managed by Richard M. Cooley ("Mr. Cooley"), the former spouse of Kathleen Cooley ("Ms. Cooley"). At least as of March 25, 1992, Ms. Cooley was the sole shareholder of the Debtor. National Creditors Group Corporation ("NCG") was incorporated on May 26, 1989, and is currently engaged in the

collection business. Medical Technical Services, Inc. ("MTS") was incorporated on August 15, 1988, by Ms. Cooley, and it is engaged in the business of auditing medical bills to determine whether medical service providers have collected all sums due. At least as of March 25, 1992, MTS was owned by Mr. and Ms. Cooley, with Ms. Cooley holding the majority of the shares. Professional Billing Services ("PBS") commenced its operations in 1985; however, it was never incorporated. PBS is engaged in the business of providing billing services for medical professionals.

RKC Development Corporation ("RKC") was incorporated on September 14, 1988, and is engaged in the sole business of owning and operating an office building located at 6450 East Broad Street, Columbus, Ohio 43213 ("Broad Street building"). At least as of March 25, 1992, RKC was owned by Mr. and Ms. Cooley, with Ms. Cooley holding a majority of the shares. All of the above-described entities were housed in the Broad Street building; however, only two of the entities, the Debtor and MTS, were the subject of lease agreements with RKC. Currently, MTS, NCG, and PBS are operating in space located at 6434 East Main Street, Reynoldsburg, Ohio 43068 ("Main Street building"), leased by MTS from Donley Brothers, an unrelated third party.

Mr. Cooley had substantial experience in the collection industry that predates the incorporation of the Debtor, and was primarily responsible for the Debtor's operations for a significant period pre-petition. Ms. Cooley testified that in 1985 it was discovered that Mr. Cooley had a brain tumor, and that in approximately 1987 he had brain surgery. Subsequent to this development, Mr. Cooley relocated to Florida, and was to have continued his work on behalf of the Debtor through a computer and modem. This arrangement did not work, and Mr. Cooley's formal association with the Debtor ceased as early as April 1992.

In 1992, Ms. Cooley's son, David Cooley, had surgery related to a kidney illness. On February 5, 1993, Mr. Cooley filed a Complaint for Divorce against Ms. Cooley in the Franklin County Court of Common Pleas. The entities that are parties to this litigation were also named as defendants in the divorce proceeding. David Cooley died in 1994. On July 26, 1994, an Agreed Judgment Entry—Decree of Divorce was entered, and on this basis Ms. Cooley acquired sole ownership of MTS and RKC. All of these family problems contributed to the decline in the Debtor's apparently once successful business.

In addition to these personal problems, on March 18, 1993, litigation was commenced in the United States District Court for the District of Oregon by Consolidated Freightways of Delaware, Inc. ("Consolidated") against the Debtor. Consolidated alleged the Debtor failed to pursue collection of freight claims that are now time-barred, and that it has suffered damages in excess of one million dollars. This litigation involved substantial discovery disputes and never progressed to trial due to the intervening bankruptcy proceeding. This litigation and the withdrawal of the Consolidated accounts also contributed to the decline in the Debtor's business.

On January 4, 1994, a voluntary petition for relief under chapter 7 of the United States Bankruptcy Code was filed on behalf of the Debtor. The petition was signed by Ms. Cooley as president, under penalty of perjury, and included a corporate resolution signed by Ms. Cooley as chairman of the board.[1] The petition was signed by John F. Cannizzaro ("Mr. Cannizzaro") as attorney for the Debtor. On the Schedule B—Personal Property, the Debtor listed that there was no cash on hand, that there was office equipment, furnishings, and supplies having a val-

---

1. Ms. Cooley signed two declarations in the bankruptcy filing, one for the Statement of Financial Affairs, and one for the Schedules that track the Official Bankruptcy Forms. The declaration for the Schedules, for example, provides in relevant part:

I, the President of [sic] corporation named as debtor in this case, declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of 11 sheets, and that they are true and correct to the best of my knowledge, information and belief ... PENALTY FOR MAKING A FALSE STATEMENT OR CONCEALING PROPERTY. Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. [sic] 152 and 3571.

ue of only $3,000.00, and that there was a Wang computer having a value of $500.00.

In the schedules, loans to Bank One and Fifth Third were detailed, and Ms. Cooley and Mr. Cooley were listed as co-debtors on these obligations. In the schedules, Ms. Cooley was listed as a creditor for wages and operating loans. RKC was listed as a landlord on Schedule G, and the Debtor indicated that the lease obligation was being rejected. RKC was also listed as being owed unpaid rent. No mention was made in the schedules of the other entities as either debtors or creditors. No transfers were listed in response to Question Number 10 on the Statement of Affairs, and no receivables were scheduled.

During the course of the trial, the Defendants presented an estimated balance sheet for the Debtor as of the date of filing that paints a sharply different picture. It reflects, in relevant part, cash of $1,800.00, accounts receivable related to Consolidated in the amount of $60,000.00, and furniture and fixtures in the amount of $24,000.00. It is interesting to note that the December 1993 bank statements for Debtor's accounts show balances as of the end of the month in the amount of $20,332.69. These statements reflect activity a mere four days prior to filing. The statement for the Debtor's trust account dated January 31, 1994, shows a negative balance of $45.19, and the majority of the checks were paid after the date of filing.

On January 10, 1994, Frederick Luper of the law firm of Luper, Sheriff & Neidenthal ("Mr. Luper") was appointed as interim trustee. Nearly four months later, on May 2, 1994, Mr. Luper filed a Motion for an Order Recusing Him from His Appointment as Trustee and For Appointment of Successor Trustee. This Motion was based upon the fact that his firm had served as collection counsel for the Debtor. Indeed, the record demonstrates that Mr. Luper's firm continued to collect on the Debtor's accounts, postpetition, along with the firm of Arter & Hadden, that currently represents Ms. Cooley and some of the entities involved in this litigation through Grady L. Pettigrew, Jr. ("Mr. Pettigrew"). On May 17, 1994, Arnold S. White was appointed as successor trustee ("Trustee").

Significant efforts were made by Consolidated and the Trustee to obtain financial information from Ms. Cooley, the entities, and their banks. Such efforts were strenuously opposed by Ms. Cooley on behalf of the entities. On February 10, 1995, the Trustee filed the instant adversary proceeding that initially only sought substantive consolidation. The Amended Complaint that is currently at issue was filed on October 23, 1995, to add two counts related to the turnover of funds by MTS and NCG. On November 3, 1995, an initial pretrial was held, at which time December 20, 1995, was established as the discovery deadline, and dispositive motions were to be filed by January 22, 1996. A final pretrial was set for January 25, 1996, and trial was scheduled for February 7, 8 and 9, 1996.

The Court recalls that during the course of the initial pretrial, the parties discussed the availability of certain information stored on the Debtor's Wang computer. It was stated that the data could not be copied and/or printed and would have to be reviewed from the screen. Accordingly, the Court directed the parties to establish a time to view the data from the screen. At the final pretrial conducted on January 25, 1996, the Court learned that the information that earlier could not be copied and/or printed, had now been lost due to a computer crash.

On February 5, 1996, two days prior to the trial that had been scheduled since November 1995, and more than a year subsequent to the commencement of discovery, Mr. Pettigrew filed on behalf of Ms. Cooley, NCG, RKC and PBS a Motion for Continuance. Mr. Cannizzaro, on behalf of the Debtor, joined in this Motion. The basis for this Motion was expressed in relevant part as follows:

> The most significant event regarding the Defendants' preparation for the trial of this matter took place on Monday, January 29, 1996 at approximately 10:00 a.m. when Arter & Hadden received certain unsolicited disclosures concerning: information; documents; previous discovery; and, the conduct of Defendants, Kathleen Cooley

and National Creditors Group, all of which relate to this case. In light of the disclosures, Arter & Hadden undertook and [sic] investigation of the information received and provided the client with the opportunity to respond to that information. Such evidence is attached hereto as Exhibit A and full [sic] incorporated herein.

\* \* \* \* \* \*

In light of the information in the possession of counsel for the Defendants, there is evidence that money is owed to the estate of Creditors Service Corporation and possibly to Consolidated Freightways. Counsel has no awareness of how much money is owed and how that money will be restored by the appropriate Defendants. Cooley has stated to counsel that she will explain the documents and make appropriate disclosure to the Court and the parties ...

The ominous Exhibit A, referred to above, included a list of and copies of twelve checks that represented post-petition collections and payments. Some of the checks were issued by law firms, including Luper, Sheriff & Neidenthal and Arter & Hadden, to the Debtor and NCG. A review of the checks written to the Debtor post-petition indicates that they were negotiated by NCG. Also, a review of the checks written to NCG by Arter & Hadden post-petition indicates that they pertain to the accounts previously forwarded to Arter & Hadden for collection by the Debtor.[2]

On February 6, 1996, the Court entered an Order Denying Motion of Defendants for Continuance of Trial, and a Notice of Appeal was filed. On February 6, 1996, a Motion for Disqualification of Judge on Grounds of Personal Bias and Case Reassignment to Another Judge, and a Motion by Defendants/Appellants for Stay of Trial Pending Appeal were filed. The Disqualification Motion was based upon this Court's prior rulings and by its demand that there be full and complete disclosure of financial information. Both the Disqualification Motion and the Stay Motion were heard and denied on February 7, 1996. On that same day the Court commenced the trial.

At the conclusion of the presentation of evidence by the Trustee and Consolidated, an oral Motion for Directed Verdict was made by some of the Defendants. This Motion was most notable for its exclusion of the Debtor and NCG. The practical effect was the concession that the Debtor and at least NCG should be substantively consolidated, and no defense was presented on their behalf. The trial lasted several days longer than originally scheduled, and it was evident from the acrimonious behavior of the parties, and most notably their counsel, that they did not appropriately communicate or cooperate prior to and during the trial. Given the complexity of this case, and in particular the volume of documents, more communication and cooperation would have expedited the process.

The focus of the trial revolved around various transactions and connections between the various entities and Ms. Cooley. The impression left and the conclusion reached is that while some of the entities may be legally distinct and perform different functions, they were funded and operated as if they were a single enterprise. The enterprise was owned and controlled by Ms. and Mr. Cooley, or currently by Ms. Cooley, and is engaged in the businesses of collections, billing and auditing of bills.

The connections, transactions, and factors taken into consideration include:

a. All of the entities operated from the Broad Street building, and they shared the Wang computer system and telephones;

b. The Debtor obtained and paid for insurance policies that covered all of the entities, and Mr. and Ms. Cooley;

---

2. It is extremely difficult for the Court to understand why both the law firms of Luper, Sheriff & Neidenthal and Arter & Hadden did not act upon and/or become aware of their own post-petition collection activities when they took on the responsibility of representing the former trustee and Ms. Cooley and various entities, respectively. At a minimum, the apparent belated, serendipitous discovery by Arter & Hadden of its post-petition collections, was an unnecessary distraction.

c. Some employees performed work for more than one entity, and employees working for one entity were paid by another;

d. The retention of Debtor's funds by NCG post-petition without notice to the Trustee and without benefit of a Court order;

e. Alleged and undocumented loans among the entities and alleged and undocumented loans made by Ms. Cooley to the entities;

f. The apparent payment of a salary to Ms. Cooley for her services to MTS through the Debtor and reimbursement by MTS to the Debtor through a "management fee";

g. The sale by RKC of what appears to be Debtor's office furniture post-petition without notice to the Trustee and without a prior order;

h. The lack of any rational allocation for rent paid by MTS and the Debtor to RKC;

i. The failure of the other entities to pay rent to RKC, and the failure of MTS and the Debtor to consistently pay rent to RKC;

j. Significant salaries received by officers in the years immediately preceding the filing and the alleged transfer of these sums back to the entities in the form of loans, without benefit of loan documentation;

k. The apparent payment of personal credit card obligations by the Debtor and MTS.

In order to understand the significance of these connections, transactions, and factors, it is helpful to discuss them in the context of specific entities. With reference to NCG the evidence shows that Debtors' checks were cashed and deposited by NCG post-petition without notice to the Trustee and without benefit of a Court order. While NCG had been formed long prior to the bankruptcy filing, it only became active as a result of the bankruptcy filing. The record also shows that NCG continued to collect on the Debtor's accounts post-petition, and but for the Debtor's accounts NCG would have had no work to perform. The evidence, including checks and testimony of collection counsel and the Debtor's former operations manager, is insurmountable and clearly demonstrates that NCG simply started where the Debtor stopped.

Indeed, the Court is surprised by the utter arrogance and brazen manner in which the Debtor's business continued and indeed operates today under the guise of NCG, even though a chapter 7 petition and schedules were filed more than two years ago that fail to make any reference to this activity. No effort has been made to date to amend the schedules. In view of these actions, the Court can only conclude that Ms. Cooley, as principal of the Debtor and NCG, acted fraudulently to conceal from creditors and the Trustee assets of the estate; i.e., the accounts that were being collected and the proceeds, including commissions.[3]

With reference to PBS, the record indicates that the enterprise was created by Ms. Cooley based upon her interest in physician billing. While it performs this function, which is distinct from the other entities, it was never incorporated and it is not a partnership. Throughout her lengthy testimony, Ms. Cooley was unable to explain, to the Court's satisfaction, the nature of the structure of this enterprise. Ms. Cooley's counsel now offers the painfully convenient explanation that PBS is a sole proprietorship of Ms. Cooley. This assertion is not persuasive in face of the evidence that is not so convenient.

First, the insurance policy purchased by the Debtor bears an endorsement for entities and individuals covered. On this endorsement PBS is listed as a division of the Debtor. Alicia Jeffries, Ms. Cooley's daughter and one of the persons that performed work for PBS, testified that she thought PBS was a division of the Debtor when it began operating, and that at some point she was told by Ms. Cooley that this was no longer the case.

---

3. At a minimum, all of the information that appears as the "Exhibit A" to the Motion to Continue discussed above, and that was or should have been known by Ms. Cooley and her counsel, Messrs. Cannizzaro and Pettigrew, should have made its way to the schedules by now. The Court is especially troubled by the lack of any effort by Mr. Cannizzaro, as counsel to the Debtor and an officer of the Court, to file appropriate amendments.

Joe Francisco, the Debtor's operations manager, also testified that he thought PBS was part of the Debtor. In the Complaint for Divorce filed by Mr. Cooley on February 5, 1993, PBS is described as a division of the Debtor.

It appears that as of the date of filing of the Debtor, January 4, 1994, PBS had no assets and liabilities according to estimated balance sheet information supplied by the Defendants at the trial. A review of checks shows that at different times PBS collections were deposited into the accounts of the Debtor, its successor, NCG and MTS. Based upon data supplied by the Defendants at the trial, PBS and the Debtor had two employees in common, Alicia Jeffries and Ralph Hamilton. While Alicia Jeffries was an employee of PBS, she did receive some paychecks from the Debtor, NCG, and MTS. Also, the Defendants admit in their post-trial brief that PBS never filed separate tax returns and that, "its income was paid to the company employing its workers and has been accounted for." (Post–Trial Brief at p. 11.)

Based upon all of this data, the Court concludes that PBS has no distinct legal existence, and was operated as an unincorporated division of the Debtor. Accordingly, by definition, and without regard to substantive consolidation, PBS is and has always been a part of the Debtor's bankruptcy proceeding and subject to the Trustee's administration.

The relationship between the Debtor and MTS and the other entities is far more complex. MTS was an enterprise established by Ms. Cooley based upon her interests regarding medical bill auditing. The clarity, however, ends at this point. As in the case of PBS, the Debtor paid for insurance that included coverage for MTS. MTS occupied the Broad Street building along with the Debtor, and utilized the computer and telephone systems owned by the Debtor. Data supplied by Defendants at the trial indicates that there were some employees who performed work for both MTS and PBS, which this Court has determined is an unincorporated division of the Debtor.

The connections become even more complex when financial transactions are examined. Evidence was provided that indicates the salary of Ms. Cooley related to MTS was paid by the Debtor, and that there was a fee reimbursement procedure between the Debtor and MTS. The Court understands that this arrangement was driven by tax considerations; however, this process only serves to emphasize the degree to which the two entities were run as a team for their mutual benefit and that of the enterprise. Further, this procedure only serves to increase the difficulty in untangling the affairs of the two entities; i.e., to determine whether the Debtor has received appropriate reimbursement for all the salary paid.

The record shows that at varying points PBS funds and the Debtor's funds were deposited in MTS accounts. Also, data supplied by the Defendants at the trial; i.e., analyses and summaries of shareholder and intercompany loan activity from 1988 to 1995 for MTS, the Debtor, RKC, and Ms. Cooley, show a complex web of intercompany transactions that even after more than a year of discovery contains transactions that are characterized as "unidentified" and/or "undetailed" by Defendant's own expert witness.

The analysis of shareholder and intercompany loan activity for the Debtor indicates that during the three years subsequent to the incorporation of MTS, 1989–1991, the Debtor issued checks to MTS and Ms. Cooley. During 1991–1993, the Debtor received loans from MTS and Ms. Cooley and issued a check for partial repayment to Ms. Cooley, according to the analysis for the Debtor. The analysis of shareholder and intercompany loan activity for MTS indicates that in the years of 1988–1993, MTS issued checks to Ms. Cooley and to the Debtor. Estimated balance sheet information supplied by the Defendants at the trial shows that as of January 4, 1994, the Debtor's filing date, MTS was holding notes payable in the amount of $39,150.00. The analysis of shareholder and intercompany loan activity for MTS, however, indicates that in 1994, MTS received loans from Ms. Cooley and NCG.

These transactions lead the Court to conclude that funds were transferred between Ms. Cooley, the Debtor, MTS and NCG, as necessary, to support their respective opera-

tions or to fulfill their respective obligations. The Court is not aware of any loan documents that detail the terms for these transactions; i.e., rate of interest, length of the loan and payment amounts. Also, the Court is unable to discern with any confidence from the evidence presented whether all of the obligations have been satisfied, and if not, what are the outstanding balances. For example, when examining the tax returns of MTS and the Debtor for the tax year ending June 30, 1993, although apparently MTS made loans to the Debtor, according to Defendants' analysis, no receivables are reflected on the MTS tax return.

With reference to RKC, clearly it was a separate corporate entity established for the limited purpose of owning and operating the Broad Street building. When the full record is examined, however, RKC too becomes enmeshed in the enterprise. First, the testimony demonstrates that the secured lender, Bando–McGlocklin, required that there be lease agreements in order to provide the financing for the Broad Street building. None of the other entities, however, that operated from the Broad Street building were the subjects of lease agreements, and the record does not show they ever paid rent.

When the lease agreements for MTS and the Debtor are compared, it appears that they were obligated to pay the same monthly amount ($8,075.00); however, under the lease terms the Debtor occupied substantially more space than MTS; i.e., 7,500 square feet compared to 2,764 square feet. Even though MTS and the Debtor were obligated by lease agreements to pay rent, rent was not collected in accordance with the leases. The monthly rental amounts payable by the Debtor and MTS under the leases with RKC are substantially higher than the amount paid by MTS for the Main Street building that is the current home for the entities ($1,487.50).

The connections become even more complicated when one again examines the Defendants' own analysis of shareholder and intercompany activity for RKC. It indicates that in 1994 RKC received loans from MTS and Ms. Cooley, and that in 1995 it received loans from Ms. Cooley and MTS, and made repayments to Ms. Cooley, MTS and NCG. As in the case of MTS and the Debtor, the Defendants' analysis for RKC contains unidentified activity. Estimated balance sheet information supplied by the Defendants indicates that as of January 4, 1994, the Debtor's filing date, RKC was liable for loans from shareholders in the total amount of $144,600.00. The Court is also unable to discern with any confidence from the evidence presented whether all of the obligations have been satisfied, and if not, what are the current outstanding balances.

During the course of trial, to further confuse the relationship between RKC and the other entities, the Court was informed that post-petition RKC sold office furniture to a former tenant, Boeing Information Services, Inc. ("Boeing") for the sum of $17,000.00. The basis for the confusion emanates from several factors. First, it appears that the office furniture belonged to the Debtor. Estimated balance sheet information supplied by the Defendants at the trial shows that as of January 4, 1994, the date of the bankruptcy filing, the Debtor owned "furniture and fixtures" valued at $24,000.00. This same value was assigned to the Debtor's "furniture and equipment" by the Defendants' own expert in his analysis of the Debtor's value, prepared in connection with the divorce of Mr. and Ms. Cooley. Indeed, the Defendants' own expert notes that during the course of the Debtor's operating life, it acquired furniture and equipment at the original cost of $239,000.00. Also, on cross-examination, Defendants' expert testified that he believed the Debtor owned the property that was sold. On the other hand, estimated balance sheet information for RKC as of January 4, 1994, the date of the Debtor's bankruptcy filing, presented at the trial by Defendants, shows only that it owned the land and building and an unexplained item designated as "Other Assets" in the amount of $8,900.00. Defendants belatedly and for purposes of trial now offer that the items were fixtures and saleable by RKC without notice to the Trustee and without an order from this Court.

Second, the transaction itself is confusing because it appears to have been negotiated by Nancy Peto, whom Defendants have as-

serted was an MTS employee, not an employee of RKC. It becomes even more confusing when one compares lease agreements supplied to the Trustee by the Defendants with the lease agreement presented at the trial by the Defendants. The former document makes no reference to any sale of furniture to Boeing and ends at paragraph 32; however, the latter document references the sale to Boeing that is detailed in an additional paragraph, labeled paragraph 33. The origin of paragraph 33 remains a mystery.

As in the case of the Debtor, NCG and MTS, the Court concludes that RKC was an integral part of the enterprise and was indeed dependent upon the other entities for its initial and continued existence. The record indicates that now that the Broad Street building has been vacated by all of the entities, the mortgage may be called due. This is based upon the fact that apparently under the loan documents, occupancy by the entities was not only the basis for, but required, under their terms. MTS and the Debtor supplied the requisite lease agreements to support the initial loan to acquire the Broad Street building; however, to assist in their operations, rent was not collected in accordance with the leases. Also, at times RKC was the recipient of loans from MTS, NCG and Ms. Cooley.

Finally, we turn to Ms. Cooley, as the Trustee has requested to join her financial affairs with the Debtor and all of the entities discussed above. Ms. Cooley is an individual who has distinct assets and liabilities, and she has not personally sought bankruptcy relief. Ms. Cooley, however, currently owns and controls the Debtor and all of the other entities discussed in this opinion, and those entities have been a significant source of income for her and Mr. Cooley. In addition, Ms. and Mr. Cooley have served as guarantors on obligations of the Debtor, and there are numerous financial transactions between the entities and Ms. Cooley. All of these connections serve to complicate what would otherwise be a simple relationship between a business and its shareholder.

The records indicate that in the three years prior to the filing of bankruptcy by the Debtor, salaries to officers were paid by the Debtor in the following amounts: 1991 ($268,667.00), 1992 ($240,000.00), and 1993 ($110,000.00). These salary amounts total $618,667.00. As discussed above, the Debtor's financial difficulties began during the years of 1992 and 1993, and the Trustee's accountant has produced an analysis that indicates the Debtor's operations would have been profitable for those years with the deduction of salaries to officers.

The analysis of shareholder and intercompany loan activity for the Debtor indicates that in 1992 and 1993, when the Debtor was beginning to experience financial difficulty and paid the high salaries to officers, it was simultaneously receiving loans from Ms. Cooley and MTS. During the years of 1992, 1993, 1994 and 1995, Ms. Cooley was also making loans to RKC and MTS and was receiving some repayment from those entities, according to the analyses supplied by the Defendants. Also, the record in the divorce proceeding indicates that subsequent to Mr. Cooley's relocation to Florida, MTS paid the sum of $43,121.27 on credit card obligations allegedly incurred by Mr. Cooley, while during the same period the Debtor paid the sum of $9,422.04 on other credit card obligations allegedly incurred by Mr. Cooley.

All of these transactions only serve to blur the financial affairs of the entities and Ms. Cooley. They also serve to demonstrate that the financial affairs of the entities and Ms. Cooley were interdependent; i.e., salaries were paid to Ms. Cooley while she loaned money to the entities in addition to the loan transactions between the entities. All of these connections lead the Court to conclude that the individual, Ms. Cooley, is hopelessly entangled in the financial affairs of the Debtor and the other entities, and this arrangement was purposeful—for the mutual benefit of Ms. Cooley and the entities.

Although the Bankruptcy Code does not specifically authorize bankruptcy courts to substantively consolidate entities and individuals, the broad equitable power detailed in section 105(a) has been recognized as the basis. *In re Munford, Inc.,* 115 B.R. 390, 397 (Bankr.N.D.Ga.1990); *In re Tureaud,* 45 B.R. 658, 662 (Bankr.N.D.Okla.

1985), *aff'd* 59 B.R. 973 (N.D.Okla.1986); *In re New Center Hospital,* 179 B.R. 848, 853 (Bankr.E.D.Mich.1994), *aff'd in part, rev'd in part,* 187 B.R. 560 (E.D.Mich.1995).[4] Substantive consolidation may be limited to certain classes of claims, specific property, or may be appropriately conditioned. *See In re Steury,* 94 B.R. 553, 557 (Bankr.N.D.Ind. 1988); *In re Cooper,* 147 B.R. 678, 682 (Bankr.D.N.J.1992); *In the Matter of Continental Vending Machine Corp.,* 517 F.2d 997, 1001 (2d Cir.1975); *cert. denied sub nom. Talcott v. Wharton,* 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976); *In re Parkway Calabasas, Ltd.,* 89 B.R. 832, 837 (Bankr.C.D.Ca.1988), *aff'd* 949 F.2d 1058 (9th Cir.1991).

Practically, substantive consolidation is similar to the state law remedy of piercing the corporate veil based on a finding that the entities are alter egos. *See J. Stephen Gilbert, Note, Substantive Consolidation in Bankruptcy: A Primer,* 43 Vand. L.Rev. 207 (1986); *In re Cooper,* 147 B.R. at 683–84. Piercing the corporate veil, however, is not a prerequisite to the utilization of the bankruptcy law remedy of substantive consolidation. *In re Munford,* 115 B.R. at 394, *citing In re Tureaud,* 59 B.R. at 975–76; *In re Snider, Inc.,* 18 B.R. 230, 234 (Bankr. D.Mass.1982). The bankruptcy remedy of substantive consolidation ensures the equitable distribution of property to all creditors, while on the other hand, piercing the corporate veil is a limited merger for the benefit of a particular creditor. *See In re Cooper,* 147 B.R. at 683–84.

Substantive consolidation is considered an extreme remedy because the process creates one common pool consisting of assets, liabilities and a single body of creditors, while extinguishing the intercorporate liabilities of the consolidated entities. *In re Cooper,* 147 B.R. at 682; *In re Parkway Calabasas, Ltd.,* 89 B.R. at 836–37; *In re Steury,* 94 B.R. at 554. Because of its extreme nature, substantive consolidation is, "no mere instrument of procedural convenience ... but a measure vitally affecting substantive rights." *Matter of Flora Mir Candy Corp.,* 432 F.2d 1060, 1062 (2d Cir.1970); *In re Crown Machine & Welding, Inc.,* 100 B.R. 25, 27 (Bankr.D.Mont.1989).[5]

The court in *In re Vecco* compiled a series of factors from several district and appellate court decisions that may be used to determine whether substantive consolidation is warranted. The factors include:

1. degree of difficulty in segregating and ascertaining individual assets and liabilities;

2. presence or absence of consolidated financial statements;

3. profitability of consolidation at a single physical location;

4. commingling of assets and business functions;

5. unity of interests and ownership between the various corporate entities;

6. existence of parent and inter-corporate guarantees on loans, and

7. transfer of assets without formal observance of corporate formalities.

*In re Vecco Construction Industries, Inc.,* 4 B.R. 407, 410. (Bankr.E.D.Va.1980).[6]

---

**4.** Parties commonly request substantive consolidation of debtor entities and/or individuals. Courts, however, have also authorized substantive consolidation of debtors and nondebtors. *Sampsell v. Imperial Paper Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941), *reh'g denied,* 313 U.S. 600, 61 S.Ct. 1107, 85 L.Ed. 1552 (1941); *In re 1438 Meridian Place N.W., Inc.,* 15 B.R. 89 (Bankr.D.D.C.1981); *In re United Stairs Corporation,* 176 B.R. 359 (Bankr.D.N.J.1995); *In re Tureaud,* 59 B.R. 973; *In re Crabtree,* 39 B.R. 718 (Bankr.E.D.Tenn.1984).

**5.** Courts are cautioned to use the procedure sparingly and cautiously because an overaggressive approach could lead to a series of fraudulent conveyances being considered a commingling of

assets that may justify substantive consolidation. *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir.1966); *In re Snider,* 18 B.R. at 234; *In re Steury,* 94 B.R. at 554; *In re Donut Queen, Ltd.,* 41 B.R. 706, 709 (Bankr. E.D.N.Y.1984); *see also In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515, 519 (2d Cir.1988).

**6.** Several courts have utilized the *In re Vecco* factors. *See In re Murray Industries, Inc.,* 119 B.R. 820, 830 (Bankr.M.D.Fla.1990); *Eastgroup Properties v. Southern Motel Assoc. Ltd.,* 935 F.2d 245, 249 (11th Cir.1991); *In re Baker & Getty Financial Services, Inc.,* 78 B.R. 139, 142 (Bankr. N.D.Ohio 1987), *aff'd* 974 F.2d 712 (6th Cir. 1992); *In re Snider Bros.,* 18 B.R. at 234; *In re*

Courts adopting the *In re Vecco* test have uniformly cautioned that the factors, standing alone, are not dispositive of the issue to consolidate. *See In re Donut Queen*, 41 B.R. at 709–10; *In re Snider*, 18 B.R. at 234. *In re Steury*, 94 B.R. at 554; *In re Cooper*, 147 B.R. at 682. "Rather, [the factors] should be evaluated within the larger context of balancing the prejudice resulting from the proposed order of consolidation with the prejudice the movant alleges it suffers from debtor's separateness." *In re DRW Property Co. 82*, 54 B.R. at 495. The factors merely provide the framework to assist the Court's inquiry whether harm will result in the absence of consolidation. *In re Cooper*, 147 B.R. at 682.

After a court has decided it has the factual justification to substantively consolidate entities, the ultimate inquiry involves a balancing of the equities based on the bankruptcy court's inherent powers pursuant to § 105. *In re F.A. Potts & Co., Inc.*, 23 B.R. 569, 571–72 (Bankr.E.D.Pa.1982); *In re Donut Queen*, 41 B.R. at 709–10; *In re Snider*, 18 B.R. at 238; *In re Steury*, 94 B.R. at 554. This Court must be convinced that a harm or prejudice to creditors will occur in the absence of substantive consolidation by weighing the equities favoring consolidation against the equities favoring the debtor remaining separate from the entities and the individual. *In re Donut Queen*, 41 B.R. at 709.[7]

The Court has considered all of the facts detailed above in the context of the cited case law and has come to the conclusion that substantive consolidation of all the entities and the individual, Ms. Cooley, is warranted subject to restrictions specified below. Three primary reasons dictate this conclusion. First, this bankruptcy case and adversary proceeding have involved hundreds of documents and numerous hours of testimony that detail a complex web of transactions among the entities and the individual. Even after more than a year of discovery, some of the transactions remain unexplained, even by Defendants' own expert. A cursory review of the documents demonstrates a labyrinthine system of transactions involving the entities, two accounting firms and Ms. Cooley. This confusion is not aided by Ms. Cooley's continued, professed lack of knowledge and reliance upon professionals, whose explanations are either nonexistent or are incomplete. The Court, unlike the Defendants and their counsel, is not sanguine that this gross confusion may be remedied by the passage of time and a few amended pleadings and tax returns. Indeed, the Court concludes from its review of the record that the untangling, identification, and pursuit of individual transactions as preferences or conveyances, even if possible, would be so costly as to substantially reduce or eliminate any potential recovery to creditors.

Further, there is substantial evidence that at least in the case of the relationship between the Debtor and NCG, fraud has been committed by virtue of the concealment of the Debtor's post-petition business operations. One can only assume that in the absence of the instant proceeding the charade would have continued until all hope of recovery had been lost. The unauthorized sale of what appears to be the Debtor's furniture, post-petition, is even more brazen. Such actions can only lead this Court to conclude that if left to their own devices, the entities and the individual, Ms. Cooley, would have taken every action possible to thwart creditors' efforts to obtain recovery.

Second, based upon this Court's review of the voluminous records and testimony, it must conclude that the financial wherewithal and financial affairs of the entities and Ms. Cooley are so entangled that they constitute a single enterprise. While some of the enti-

---

*Augie/Restivo*, 84 B.R. 315, 321 (Bankr.E.D.N.Y. 1988), *rev'd after district court aff'd*, 860 F.2d 515 (2d Cir.1988); *In re DRW Property Co. 82*, 54 B.R. 489, 495 (Bankr.N.D.Tex.1985); *In re Steury*, 94 B.R. at 554; *In re Luth*, 28 B.R. 564, 566 (Bankr.D.Idaho 1983); *In re Donut Queen*, 41 B.R. at 709; *In re New Center Hospital*, 179 B.R. at 856.

7. Once this Court determines substantive consolidation is warranted, it must be effective as of the filing date of the Debtor. *In re Baker & Getty*, 974 F.2d at 721; *In re New Center Hospital*, 187 B.R. at 572; *In re Evans Temple Church of God in Christ*, 55 B.R. 976, 982 (Bankr.N.D.Ohio 1986).

ties are separate on paper, in practice they are treated as one enterprise by their principal, Ms. Cooley. The needs of all are satisfied from available resources, and the entities are used to defray significant personal costs without regard to their separate identity. Contrary to Defendants' assertions, the relationship is much closer than the mere sharing of a telephone system, a building, furniture, a computer, and some employees and may be best characterized as symbiotic.

Third, the Court has struggled considerably with trying to balance the equities in this case. The decision has not been an easy one in view of the extraordinary impact of substantive consolidation upon the entities, Ms. Cooley, and their creditors. The Court has concluded, however, the benefit of substantive consolidation far outweighs any detriment. In this endeavor, the Court has taken into account that none of the creditors of the subjects of the consolidation proceeding have objected. Indeed, a significant unsecured creditor, Consolidated, has joined and actively participated in the Trustee's effort to obtain substantive consolidation. The Court has also considered that in view of the state of the financial records and the complex relationships, the cost of recovery proceedings in bankruptcy would substantially reduce or eliminate any possible return to creditors.

The only remaining concern for the Court is the impact of substantive consolidation upon the financial health of the entities. It must not be overlooked that currently they are operating, and they are managed and controlled at the present by one individual, Ms. Cooley. Obviously, substantive consolidation will alter the current dynamics and could conceivably prove so disruptive to the operations that the return to creditors would be affected. Accordingly, substantive consolidation in this case will be subject to certain limitations and requirements.

First, prior to the liquidation of any assets and the cessation of any of the businesses, the Trustee and Ms. Cooley shall attempt to enter into an interim operating arrangement for the entities, as contemplated by § 721 of the United States Bankruptcy Code. Such an arrangement should provide for the day-to-day operations to continue with the assistance of Ms. Cooley, with the Trustee maintaining control over all bank accounts, business and personal, and may provide for an appropriate salary for Ms. Cooley. Within twenty days from date of entry of this Memorandum Opinion and Order, an agreed entry shall be presented, and if an agreement has not been reached, the Trustee shall file a motion requesting further instructions. Upon receipt of an agreed order or motion, the parties will receive further instructions from the Court.

Second, the Trustee shall assemble and review claims information and determine what objections may be filed, including but not limited to any claim of Consolidated. This exercise will provide the Trustee an estimate as to the level of recovery necessary to satisfy claims, and this process should be completed within one hundred twenty days from the entry of this Memorandum Opinion and Order. The Trustee should proceed forthwith to contact the Clerk's Office to arrange for the issuance of a claims notice for the consolidated estate.

Third, the Trustee shall offer for sale to Ms. Cooley the entities as operating businesses along with all other assets, subject to higher and better offers and to applicable provisions of the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules. An appropriate sale to Ms. Cooley may serve to obviate the Court's concerns with the ongoing operations, and obviously, Ms. Cooley has a significant interest in regaining her ownership of the entities as a source of continued income. An appropriate sale amount should take into consideration the level of valid claims, professional fees and costs, and any other administrative expenses compared to the value of assets available for distribution.[8] If a sale to Ms. Cooley or any other interest-

---

**8.** While the parties through cooperation and communication may devise means to accomplish a sale, the Court notes there are various alternatives. For example, the assets may be refinanced to fund an immediate sale, or an installment sale could be financed through the maintenance of a security interest by the substantively consolidated estate. Another means the parties may wish to consider is the filing of a chapter 11 plan for the substantively consolidated estate.

ed party cannot be accomplished within six months from date of entry of this Memorandum Opinion and Order, the Trustee shall immediately cease all operations and commence an orderly liquidation of all assets as further prescribed by this Order.

Fourth, in the event that the Trustee is unable to reach an accommodation with Ms. Cooley for a sale, this substantive consolidation order is subject to an additional limitation. This limitation will preclude the liquidation of what were Ms. Cooley's personal assets until all of what were the entities' assets have been administered. This restriction is imposed on the theory that the business-related assets, after claims objections, may prove sufficient to satisfy creditors. In this manner, some of the impact upon the former personal creditors and Ms. Cooley will be deferred until it is evident that those resources will be required to provide a recovery. During this period, however, Ms. Cooley is hereby ENJOINED from attempting to dispose of any assets. No rent shall be charged by the substantively consolidated estate.

Fifth, while the Court understands the frustrations of the Trustee in view of the actions of Ms. Cooley, the acrimony evident on all sides at the trial must end to ensure the efficient administration of the consolidated estate. The Court has concluded that this goal may be aided by the intervention of a neutral third party that is unburdened by the ill will generated during the course of litigation. The Court also concludes that this role can most economically and should be performed by the United States Trustee pursuant to 28 U.S.C. §§ 586(a)(1) and (3)(G).

Specifically, the Court envisions that the United States Trustee will closely supervise and monitor the administration of the consolidated estate, including but not limited to participation in any negotiations and formulation of plans for the administration of assets in accordance with this Memorandum Opinion and Order. The United States Trustee is ORDERED to commence performance of this function immediately, and the United States Trustee is further ORDERED to file an initial progress report with the Court within twenty (20) days from entry of this Memorandum Opinion and Order, followed by monthly reports commencing June 28, 1996. Subsequent reports must be filed by the end of each month.

All parties should understand that these limitations and requirements in no way indicate that this Court has wavered on its conclusion that substantive consolidation is warranted. These restrictions are imposed in recognition of the economic realities of substantive consolidation and in an effort to maximize recovery while minimizing the resultant disruption. Also, the Court views these limitations and requirements as some practical solutions that the parties may have considered had they communicated and cooperated prior to and during the course of the trial. If Ms. Cooley does not wish to participate in this process and/or fails to fully cooperate with the Trustee and/or the United States Trustee, then an orderly liquidation of assets will be ordered in accordance with this Memorandum Opinion and Order and any further instructions issued by the Court.

Since the Court has determined that substantive consolidation is appropriate, that portion of the Trustee's and Consolidated's Complaints requesting turnover of funds and/or information is rendered moot. Accordingly, it is hereby ORDERED that all of the entities detailed in this Opinion and Ms. Cooley are substantively consolidated with the Debtor as of January 4, 1994.

**IT IS SO ORDERED.**